Alan M. MacEWAN and Mary G. Mac-
Ewan, Lincoln University, Pennsyl-
vania, Plaintiffs,

v.

Dean RUSK, Secretary of State, Depart-
ment of State, Washington, D. C., and
Robert F. Kennedy, Attorney General,
Washington, D. C., Defendants.

Civ. A. No. 33038.

United States District Court
E. D. Pennsylvania.

March 30, 1964.

Judgment April 20, 1964.

Leonard B. Boudin, of Rabinowitz & Boudin, New York City, for plaintiffs.

Benjamin C. Flanagan, Dept. of Justice, Washington, D. C., for defendants.

FREEDMAN, District Judge.

Plaintiffs seek a declaratory judgment which in effect would declare invalid regulations issued by the Secretary of State pursuant to which he has refused to endorse their passport for travel to and from Cuba.

Plaintiffs originally sought the invocation of a three-judge court pursuant to 28 U.S.C. § 2282, but they withdrew this request when the case was called for argument. They no longer seek to enjoin the enforcement or operation of any Act of Congress, but ask merely a judgment declaring that they may lawfully travel to Cuba without special validation of their passport. They have perhaps narrowed the scope of the remedy sought because present counsel had just argued the same questions in their widest form before a three-judge court convened in the District of Connecticut.[1] The case is before me on motions for summary judgment filed by the respective parties.

The problem presented falls into several broad categories. One is whether the President, acting by the Secretary of State, has inherent power to impose geographical restrictions upon travel by American citizens in furtherance of the

1. The decision of the three-judge court was announced since the argument before me. The travel restriction was held valid by a divided court. Zemel v. Rusk, 228 F.Supp. 65, decided Feb. 21, 1964.

President's authority in the conduct of foreign affairs. Another is whether, aside from inherent power, there is a statutory foundation for executive promulgation of geographical restrictions on travel abroad. Finally, there is the constitutional question of the extent to which the Government may interfere with travel abroad by its citizens.

## I

■ I begin with the emphatic statement by the Supreme Court in Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L. Ed.2d 1204 (1958): "The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." (357 U.S. p. 125, 78 S.Ct. p. 1118, 2 L.Ed. 2d 1204). There is language in Kent v. Dulles that any regulation of such right "must be pursuant to the law-making functions of the Congress". (357 U.S. p. 129, 78 S.Ct. p. 1120, 2 L.Ed.2d 1204). Kent v. Dulles must be read, however, in the light of the question involved, a limitation which the Court itself was careful to point out. The opinion of the Court states, for example, that if it "were dealing with political questions entrusted to the Chief Executive by the Constitution we would have a different case". (357 U.S. p. 129, 78 S.Ct. p. 1120, 2 L.Ed. 2d 1204). The Secretary of State had sought in that case to curtail the right of travel because the applicants refused to permit inquiry into their beliefs and associations.

The present case is far removed from any restriction on a citizen's travel because of his beliefs or associations. The Secretary has not applied a test personal to the plaintiffs. He has enforced a geographical limitation applicable to everyone without regard to individual personality, beliefs or associations. The prohibition has been applied, not because the Secretary has found the plaintiffs to be personally ineligible, but rather because they seek to travel to an area which in a kind of in rem determination has been declared out of bounds for travel by Americans.

■ Under our constitutional system the President is empowered to conduct the foreign policy of the United States, and "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations * * * does not require as a basis for its exercise an act of Congress * * *." [2] Congress has additionally imposed on the President the obligation to "use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release" of "any citizen of the United States [who] has been unjustly deprived of his liberty by or under the authority of any foreign government * * *." (22 U.S.C. § 1732). These powers and duties vested in the President justify his determination from time to time that particular areas of the globe are closed to travel by American citizens. There exist unfortunately numerous examples of areas now aflame with turmoil and violence. It would be a serious restriction of the presidential authority to conduct foreign affairs to deny to him and his authorized subordinates [3] the power to prevent travel by curious citizens to countries where their presence might jeopardize the relations of the United States with foreign countries.

■ The constitutional right to travel, like all rights, is not unlimited in time and space or circumstance. It is surrounded by innumerable restrictions, and they may be governmental as well as personal and private. National interest may require that American citizens be excluded from a specified area at a particular time for their own protection as

2. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936).

3. The Secretary of State is the President's principal arm for the executive conduct of American foreign policy. See 5 U.S.C. § 156. The President has delegated to the Secretary the responsibility for the regulation of the travel of citizens and aliens from and into the United States.

well as to prevent their interference with the proper conduct of American foreign policy. This is especially true in this era in which the line of distinction between war and peace has been blurred by the less conventional hostility of cold war. The vast scope of the interwoven military, economic and propaganda activities of the nations of the world in furtherance of their foreign policies, without any declaration of war, has expanded the field of presidential action to further American policy. Personal conduct is not inevitably deemed personal in every foreign nation. In totalitarian countries freedom of the press and of the individual is severely restricted, and those governments therefore cannot accept the notion that the conduct of individual American citizens on their soil does not necessarily reflect the policy of the American Government.

I agree with the decision of the Court of Appeals for the District of Columbia Circuit in Worthy v. Herter, 106 U.S. App.D.C. 153, 270 F.2d 905, cert. den., 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959), which upheld the power of the Secretary of State to refuse to issue a passport permitting a newspaperman to travel to mainland China. Judge Prettyman there said that "the designation of certain areas of the world as forbidden to American travelers falls within the power to conduct foreign affairs. The bare determination that certain areas outside this hemisphere are trouble spots, or danger zones, is a phase of 'foreign affairs'. Such a determination involves information gleaned through diplomatic sources and channels, and a judgment premised in large part upon foreign policy. * * * The essence of the conduct of foreign affairs is the maintenance of peace, the prevention of war. The Constitution places that task of prevention in the hands of the Executive. The two correlative powers, to conduct war and to prevent war, are Executive functions under our Constitution.

"Of course the prevention of clashes with foreign governments embraces diplomatic negotiations with those governments. But, as a matter of hard, practical reality, it also involves restrictions upon acts of our own citizens which may reasonably be foreseen as breeding clashes. History establishes that either the behavior or the predicament of an individual citizen in a foreign country can bring into clash, peaceful or violent, the powers of his own government and those of the foreign power. * * * A blustering inquisitor avowing his own freedom to go and do as he pleases can throw the whole international neighborhood into turmoil. * * * [T]he right here involved is not a right to think or speak; it is a right to be physically present in a certain place. The basis of the restriction is not personal but is the military and political situation in the designated areas." (270 F.2d pp. 910–913).

The reasonableness of restriction on travel to Cuba, if the inherent power exists, can hardly be questioned. Many expressions of hostility between the present government of Cuba and the United States have been made public, both before and after the breach of diplomatic relations between the two countries in January, 1961. The Cuban government has avowed its solidarity with world Communism and its fraternal relations with the Soviet Union and Communist China. Colossal and explosive problems confront the President in these circumstances. Tensions rose to unprecedented dimensions at the confrontation between the United States and the Soviet Union over the presence of missiles hidden in Cuba. For some days following the declaration of an embargo by the President of the United States the world lived in dread of the unleashing of a thermonuclear war in the immediate vicinity of the United States. The United States Government has since announced many times that it considers Cuba a continuing danger spot because of the ever present threat of the clandestine concealment or return of Soviet missiles. The United States has characterized Cuba as a training ground for agents of subversion who seek to undermine those governments in the southern hemisphere which are

friendly to the United States. Our Government has joined with the governments of Latin America to devise means of isolating Cuba and dealing with its threat of Communist infiltration and subversion. Among these measures is the restriction of movement between free world countries and cuba.[4] Thus the policy of the United States, reflected in congressional and executive action, recognizes the Cuban government, so close to us geographically, as an important and militant link in a movement aimed at the destruction of the influence of this country abroad and of its tranquility at home.

■ In these circumstances I hold that restriction on travel to Cuba is within the inherent power of the Executive and that this power has not been unreasonably exercised.

## II

The Secretary of State does not rely solely on inherent executive power. He claims statutory authority for the regulations he has promulgated. There are two Acts of Congress to which the Secretary points as the sources of his power. One is § 215 of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1185. The other is the Passport Act of 1926, § 1, 22 U.S.C. § 211a.

1. Section 215(a) and (b) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1185, provides: "When the United States is at war or during the existence of any national emergency proclaimed by the President, * * * and [when] the President shall find that the interests of the United States require that restrictions and prohibitions in additional to those provided otherwise than by this section be imposed upon the de-

parture of persons from and their entry into the United States, and shall make public proclamation thereof, * * * it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport." Criminal penalties are prescribed.[5]

■ Does the statute, strictly construed as it must be since it limits the constitutionally protected right of travel,[6] authorize the President to prescribe geographical limitations upon the use of a passport during the existence of any national emergency?

■ The language of the statute expressly authorizes restrictions on departure from the United States without a valid passport.[7] If the statute is broad enough to prohibit the departure of a citizen from the United States without a valid passport, it is difficult to see why a partial barrier is not within the statute. If departure may be entirely prohibited, then surely departure may be permitted except to restricted areas, on the familiar principle that the greater necessarily includes the lesser power. It is hardly likely that Congress intended that the "restrictions and prohibitions" which the President is authorized to "find that the interests of the United States require" to "be imposed upon the departure of persons from * * * the United States", should amount, at the most, to a general requirement that the citizen "bears a valid passport". The further language of the statute that the requirement it imposes is "subject to such *lim-*

---

4. See Resolutions adopted at the meeting of Ministers of Government pursuant to the Declaration of Central America, Managua, Nicaragua, April 3–4, 1963 (48 Dept. State Bull. 719, May 6, 1963).

5. § 215(c), 8 U.S.C. § 1185(c).

6. Kent v. Dulles, 357 U.S. 116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

7. It equally proscribes entry into the United States without a valid passport. In the recent case of Worthy v. United States, 328 F.2d 386, decided Feb. 20, 1964, the Court of Appeals for the Fifth Circuit held this provision unconstitutional because it deprived a citizen of his "inherent" right to re-enter his own country. No such constitutional inhibition exists on the prohibition of departure without a valid passport.

*itations* and *exceptions* as the President may authorize and prescribe", and that the prohibition runs "except as otherwise provided by the President", must be given meaning. It would have been idle to speak of "limitations and exceptions" and of provisions to the contrary by the President, if the only restriction on foreign travel that could be imposed by presidential proclamation is the requirement of a valid passport. For this would make of all these elaborate provisions a mere requirement of registration or identification, and would be far less than the statutory authorization to the President to impose "restrictions and prohibitions" on the departure of persons from the United States.

 Plaintiffs seek to support their claim of lack of legislative authority in the President to impose geographical limitations by pointing to a Special Message of President Eisenhower on July 7, 1958,[8] requesting such specific authority, and the failure of Congress to grant it. The President's request was part of a broad Message to Congress, delivered less than a month after the decision in Kent v. Dulles on June 16, 1958. A reading of it shows that it sought to place beyond dispute the right to impose travel restrictions whenever the applicant's travel was inimical to the foreign relations or the security of the United States. This included, of course, geographical restriction on travel. It is clear from a reading of the Message that it was the offspring of dissatisfaction with the decision of Kent v. Dulles. However much it may indicate a desire to overcome the effect of that decision or to remove all basis for argument on other aspects of travel restriction not personal to the citizen, such as geographical limitations, the failure of Congress to act does not answer the question of what the existing statutes authorized. For where the power had already been granted by statute, the failure of Congress to enact new legislation

amounts to no more than an unwillingness to confirm an already existing power. The request of an Executive for confirmatory legislation may result simply from the practical desirability of avoiding litigation and contest over his power.

There remains the question whether the power granted by § 215 of the Immigration and Nationality Act of 1952 was in fact brought to life by proclamation of the President of the existence of a national emergency.

President Truman by Proclamation No. 2914[9] on December 16, 1950, declared the existence of a national emergency and cited "recent events in Korea and elsewhere" and the threat of "world conquest by communist imperialism". On January 23, 1953, President Truman, acting under § 215 of the Immigration and Nationality Act of 1952, issued Proclamation No. 3004, 67 Stat. c. 31,[10] specifically stating that the national emergency which was declared by Proclamation No. 2914 on December 16, 1950, "still exists". The Proclamation prescribed a series of "rules, regulations and orders" constituting "restrictions and prohibitions, in addition to those otherwise provided by law, upon the departure of persons from and their entry into the United States". Among these was the provision that "the departure and entry of citizens and nationals of the United States from and into the United States * * * shall be subject to the regulations prescribed by the Secretary of State and published as sections 53.1 to 53.9, inclusive, of title 22 of the Code of Federal Regulations. Such regulations are hereby incorporated into and made a part of this proclamation; and the Secretary of State is hereby authorized to revoke, modify, or amend such regulations as he may find the interests of the United States to require."

The Secretary amended the regulations in 1958 by adding a provision that the

8. 104 Cong.Rec. 11849, H.Doc. No. 417, 3 U.S.Code, Congressional and Administrative News, 85th Cong., 2d Sess. (1958), p. 5405.

9. 15 Fed.Reg. 9029.

10. 18 Fed.Reg. 489.

existing regulations should not be construed "to prevent the Secretary of State from exercising the discretion resting in him to refuse to issue a passport, to restrict its use to certain countries, to withdraw or cancel a passport already issued or to withdraw a passport for the purpose of restricting its validity or use in certain countries".[11]

On January 19, 1961, the Secretary further amended the regulations by specifically excluding Cuba from those countries to which American citizens might travel without a valid passport.[12] The Secretary issued Public Notice No. 179,[13] in which he specified his reasons for the amendment to the regulations, saying: "In view of the conditions existing in Cuba and in the absence of diplomatic relations between that country and the United States of America I find that the unrestricted travel by United States citizens to or in Cuba would be contrary to the foreign policy of the United States and would be otherwise inimical to the national interest".

Plaintiffs seek to undermine the authority for the Secretary's regulation by urging that the national emergency was limited in scope and has not endured in time, because it dealt with the Korean War. Although the Korean fighting precipitated the 1950 Proclamation, it was clear even then that Korea could not be treated as an isolated trouble spot. To limit the emergency proclamation to Korea would be to ignore its finding of a threat of "world conquest by communist imperialism" based on "recent events in Korea and *elsewhere*", and to require a new presidential proclamation for each new crisis in the continuing chain of world-wide eruptions that characterize

the cold war era. In effect the Proclamation declared a national emergency because there had broken out in Korea a dangerous symptom of the problem of aggression that had "been loosed upon the world". The Proclamation therefore was not limited to Korea and it has not expired because the Korean problem is quiescent at the moment.

In the Proclamation of 1953 the President found that the "exigencies of the international situation and of the national defense still require" that additional restrictions be placed upon departure and entry into the United States. This Proclamation of the President has never been revoked. In Executive Orders in 1960 [14] and 1961 [15] the President noted the continued existence of the national emergency proclaimed in 1950, and numerous other governmental regulations still in effect are based upon that same national emergency.[16]

██ A court may not lightly hold that an executive proclamation of a national emergency has expired by lapse of time. It is true that "a Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends on the truth of what is declared".[17] But the mistake would indeed have to be "obvious" before a court would be justified in overturning a legislative or executive determination of the existence of a national emergency. The Federal Register records that the national emergency continues. World-wide events make it clear to everyone that the national emergency has not ended. I therefore conclude that the regulations which the Secretary promulgated were authorized by Congress and properly invoked by the

11. 23 Fed.Reg. 2244, April 5, 1958, 22 C.F.R. § 53.8.

12. 26 Fed.Reg. 482, 22 C.F.R. § 53.3(b).

13. 26 Fed.Reg. 492.

14. Exec.Order No. 10896, 25 Fed.Reg. 12281 (Nov. 29, 1960).

15. Exec.Order No. 10905, 26 Fed.Reg. 321 (Jan. 14, 1961).

16. E.g., Cuban Assets Control Regulations, 28 Fed.Reg. 6974, 31 C.F.R. 515.101 (July 8, 1963); See "Provisions of Federal Law in Effect in Time of National Emergency", Report to the House Committee on the Judiciary, 87th Cong., 2d Sess. (Committee Print, Jan. 25, 1962).

17. Chastleton Corp. v. Sinclair, 264 U.S. 543, 547, 44 S.Ct. 405, 68 L.Ed. 841 (1924). See also Bauer v. United States, 244 F.2d 794, 797 (9th Cir. 1957).

presidential declaration of the existence of a national emergency.

2. The Secretary of State relies separately for his authority to control travel to Cuba on the Passport Act of 1926, 22 U.S.C. § 211a. This statute, unlike the Immigration and Nationality Act of 1952 (§ 215(c), 8 U.S.C. § 1185(c)), contains no criminal penalty. It provides: "The Secretary of State may grant and issue passports * * * under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports."

In Kent v. Dulles the Passport Act was described as intended to centralize the power to issue passports in the Secretary of State and to remove such power from the various federal, state and local officials who in the past had issued passports or similar documents. (357 U.S. p. 123, 78 S.Ct. 1113, 2 L.Ed.2d 1204). The Court said that the administrative practice on refusal of passports at the time of the adoption of the Act "had jelled only" around the two categories of allegiance and criminal conduct. The specification of these two categories of administrative practice was not intended, of course, as an authoritative determination excluding all others. For the Court was dealing with administrative practice only "so far as relevant" to the question of personal beliefs of passport applicants. The Court expressly recognized that "[o]ne can find in the records of the State Department rulings of subordinates covering a wider range of activities than the two indicated. *But as respects Communists* [18] these are scattered rulings and not consistently of one pattern." (357 U.S. p. 128, 78 S.Ct. p. 1119, 2 L. Ed.2d 1204). There is a long history of administrative practice imposing geographical limitations both before and after 1926. The State Department refused to issue passports valid for travel in enemy countries during the First World War. In 1935 passports were denied for travel in Ethiopia following the Italo-Ethiopian conflict. Spain was declared "off limits" to American travelers after the Civil War erupted in 1936. Passports were stamped "not valid for travel in or to China" because of the Sino-Japanese conflict in 1937.[19] On March 31, 1938, the President issued Executive Order No. 7856,[20] which authorized the Secretary of State "in his discretion to refuse to issue a passport, to restrict a passport for use only in certain countries, to withdraw or cancel a passport already issued, and to withdraw a passport for the purpose of restricting its validity or use in certain countries".[21] In the cold war era travel to Albania, Bulgaria, China, Czechoslovakia, Hungary, Poland, Roumania, and the Soviet Union was restricted in 1952.[22] In 1955 these restrictions were removed except as to Albania, Bulgaria and Communist China, and restrictions were imposed on travel to Korea and Vietnam.[23]

These past practices were not considered by the Court in Kent v. Dulles, for they were not relevant to the problem there presented. The distinction between the denial of passports to individual Americans because of their personal beliefs and geographical limitations which are impersonal had been recognized while the Kent case was in the Court of Appeals for the District of Columbia Circuit. Judge Bazelon said in a dissenting opinion in which Chief Judge Edgerton concurred: "Proclamation No. 3004 did not undertake to grant power to the Secretary to control travel by establishing additional categories of passport ineligibility. * * * [I]t grants the Secretary discretion of the type already exer-

18. Italics supplied.

19. 3 Hackworth, Digest of International Law (1942), pp. 529–34.

20. 3 Fed.Reg. 681, 687.

21. See also another section of the same Order authorizing the Secretary to make additional regulations "on the subject of issuing, renewing, extending, amending, restricting, or withdrawing passports". 3 Fed.Reg. 687.

22. State Dept. Press Release No. 341, May 1, 1952.

23. State Dept. Press Release No. 630, Oct. 31, 1955.

cised in his existing travel control regulations, namely, to determine which parts of the world can be visited by Americans only if they have passports, but not to determine which Americans are to receive passports."[24]

■ I conclude that the Secretary has authority to impose geographical restrictions on the use of passports by virtue of his general power under the Passport Act of 1926.[25]

### III

Plaintiffs contend that § 215 of the Immigration and Nationality Act of 1952, if construed to authorize the Secretary of State to impose geographical restrictions on foreign travel, is constitutionally defective because of vagueness, because it constitutes an unlawful delegation of legislative power to the Executive, and because it constitutes a deprivation of liberty without due process.

■ 1. The argument as to vagueness is not strongly pressed. In any event, a statute making it unlawful to depart from the United States without a valid passport does not force men of common intelligence to guess at its meaning, as was the case with statutes referring to "current rate of wages,"[26] "excessive prices,"[27] "sacrilegious" publications,[28] or "violent" news.[29]

■ 2. Plaintiffs rely on Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935),

for their contention of unlawful delegation. The Supreme Court there held that the delegation of power to the President under the National Industrial Recovery Act was unconstitutional because it gave him "unfettered discretion to make whatever laws he thinks may be needed or advisable for the rehabilitation and expansion of trade or industry."[30] Soon after Schechter was decided, the Supreme Court in United States v. Curtiss-Wright Corp.,[31] upheld a broad delegation of power to the President to control the sale of arms and munitions to certain foreign countries. The Court noted that legislation in the area of foreign affairs "must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved."[32] Citing the President's superior sources of information, the Court emphasized "the unwisdom of requiring Congress in this field of governmental power to lay down narrowly definite standards by which the President is to be governed."[33]

There is an important difference between the power delegated to the President under § 215 and the complete freedom to regulate the national economy unguided by congressional policy decisions or standards which was held unconstitutional in Schechter. The President does not have the central role in the regulation of internal economic affairs that he has in the conduct of the nation's foreign relations.[34] Moreover, there is not that

24. Briehl v. Dulles, 101 U.S.App.D.C. 239, 248 F.2d 561, 581 (1957), reversed sub nom. Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

25. See Bauer v. Acheson, 106 F.Supp. 445, 449 (D.D.C.1952) : "[T]he authority to issue passports necessarily implies authority also to regulate their use and to withdraw them".

26. See Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

27. See A. B. Small Co. v. American Sugar Refining Co., 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925).

28. See Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

29. See Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

30. 295 U.S. at 537–538, 55 S.Ct. at 846, 79 L.Ed. 1570.

31. 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

32. 299 U.S. at 320, 57 S.Ct. at 221, 81 L.Ed. 255.

33. 299 U.S. at 321–322, 57 S.Ct. at 221, 81 L.Ed. 255.

34. See United States v. Curtiss-Wright Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

limitless range of choices available in passport issuance that exists in the regulation of the national economy.

Section 215 authorizes passport control in the limited circumstances of war or national emergency proclaimed by the President. It conditions such control on a finding by the President that the interests of the United States require restrictions and prohibitions on travel abroad. All this is an assertion of congressional control over travel based on the war power, combined with executive control over passports incident to the conduct of foreign affairs, and from its nature justifies a wider generality of delegation than would be permissible in the regulation of the domestic economy.[35]

■■■ 3. Finally, neither § 215 of the Immigration and Nationality Act of 1950 nor the Passport Act of 1926 construed to authorize the imposition of geographical limitations is unconstitutional. The Court in Kent v. Dulles made it clear that the liberty to travel is subject to appropriate and reasonable regulation, although it was "not [called upon to] decide the extent to which it can be curtailed". (357 U.S. p. 127, 78 S.Ct. p. 1119, 2 L.Ed.2d 1204). The restrictions which are here involved and the circumstances surrounding them have already been fully reviewed. They deal, as we have seen, with the safety of the nation in its relations with the nations of the world. Judged by the fundamental need of self-preservation, the Government's restriction on plaintiffs' freedom to travel is a reasonable one which does not deprive them of substantive due process.

## ORDER

And now, March 30, 1964, plaintiffs' motion for summary judgment is denied, and defendants' motion for summary judgment is granted. An appropriate form of judgment may be submitted by defendants on notice to plaintiffs.

## JUDGMENT

And now, April 20, 1964, the above entitled cause having come before the Court on cross-motions of the parties for summary judgment, and the Court having considered all pleadings and papers filed herein and having heard oral argument of counsel for each side, and the Court having issued and filed its opinion and order on March 30, 1964, denying plaintiffs' motion for summary judgment and granting defendants' motion for summary judgment, it is hereby adjudged and decreed that:

(1) Plaintiffs are not entitled, under the Constitution and laws of the United States, to travel to Cuba without a passport specifically endorsed by the Secretary of State for such travel;

(2) Plaintiffs' travel to Cuba without a passport so endorsed will violate the passport laws of the United States, the Immigration and Nationality Act of 1952, the State Department's rules and regulations, and the terms and conditions of their passport;

(3) Defendant Secretary of State's restrictions upon travel to Cuba are within the inherent power of the Executive and this power has not been unreasonably exercised;

(4) Defendant Secretary of State's restrictions upon travel to Cuba are authorized by the Passport Act of 1926 and by Section 215 of the Immigration and Nationality Act of 1952;

(5) Such statutes so construed do not unconstitutionally infringe upon plaintiffs' rights.

35. This is the view of Judge Fahy dissenting in Briehl v. Dulles, 101 U.S.App. D.C. 239, 248 F.2d 561, 597 (D.C.Cir. 1957), reversed sub nom. Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). See also Comment, 106 U. Pa.L.Rev. 454, 462 (1958): "Reference to war or a state of national emergency in this statute may be a sufficient standard to support the validity of passport regulations relevant to those conditions. * * * Thus, * * * the 1952 statute appears to provide the necessary standard to support the Secretary's exercise of authority to promulgate substantive regulations."