**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Cameron David BISHOP,
Defendant-Appellant.**

No. 75–1899.

United States Court of Appeals,
Tenth Circuit.

May 5, 1977.

Arthur H. Bosworth, II, Denver, Colo. (James L. Treece, U.S. Atty., Denver, Colo., with him on the brief), for plaintiff-appellee.

Michael E. Tigar, Washington, D.C. (Harold A. Haddon, Louis M. Fischer, Denver, Colo., John Mage and Cameron David Bishop, pro se, with him on the brief), for defendant-appellant.

Before LEWIS, Chief Judge, and BREITENSTEIN and SETH, Circuit Judges.

BREITENSTEIN, Circuit Judge.

The issue is whether a 1950 Presidential proclamation of a national emergency applies to sustain a prosecution for sabotage committed in 1969. Defendant was convicted of three counts of an indictment for sabotage and sentenced to concurrent seven-year terms. We reverse.

The indictment charges that with intent to interfere with, and obstruct, defense activities of the United States the defendant-appellant Bishop wilfully injured and destroyed four high voltage line towers of the Public Service Company of Colorado by use of dynamite. The towers were part of a 230,000 volt grid furnishing electricity to the Denver Metropolitan Area. In the area, and served by the Public Service Company, were contractors, including Coors Porcelain Company, Martin-Marietta Corporation, and Dow Chemical Company, which furnished military equipment to the United

States and two military installations of the United States, Lowry Air Force Base and the Rocky Mountain Arsenal. The indictment charged that the towers and the lines supported thereby were war utilities as defined in 18 U.S.C. § 2151.

All of the bombings were in January, 1969. Defendant was convicted of three separate offenses occurring respectively in Jefferson, Arapahoe, and Adams Counties, Colorado. He was acquitted of a similar charge relating to a tower in Denver. The indictment was returned February 14, 1969. Defendant was a fugitive until March, 1975, when he was arrested in Rhode Island and returned to Denver.

Participants in the bombings were Bishop, Steven Knowles, Susan Parker, and Linda Goebel. Parker and Goebel were granted immunity and testified at the trial for the prosecution. The four of them stole dynamite and blasting materials from a Colorado mine. While they were living at a cabin near Idaho Springs, Colorado, Parker and Goebel assisted defendant and Knowles in the preparation of bombs and accompanied them to the towers which were bombed. In a mine tunnel a short distance up a mountain behind the Idaho Springs cabin, agents of the Federal Bureau of Investigation found boxes of dynamite, blasting materials, and other articles. Circumstantial evidence, including fingerprints, connected defendant with the tower bombings. The defendant's intent to wilfully injure the towers was established by the testimony of Parker, Goebel, and two other witnesses. The purpose of the bombings was to create domestic turmoil which would require the government to bring back troops from Vietnam. The evidence is sufficient to sustain the conviction of the defendant.

The indictment charges violations of 18 U.S.C. § 2153(a) which proscribes specified conduct "when the United States is at war, or in times of national emergency as declared by the President or by the Congress * * *." Count I of the indictment charges a violation of § 2153(a) on "January 20, 1969, on which date there was in force

and effect, at all times a state of national emergency proclaimed by the President of the United States." Defendant was convicted on this count and also on Counts II and III which, in language similar to Count I, charged offenses on January 25 and 28, 1969. The indictments do not charge that the United States was then at war. The crucial question relates to the viability in 1969 of a Presidential proclamation declaring a national emergency.

On December 16, 1950, President Truman issued Presidential Proclamation No. 2914. See 15 Fed.Reg. 9029. The proclamation recites that the need for the action taken arises from international situations, specifically events in Korea and communist aggression. It proclaims "the existence of a national emergency" which requires the strengthening of national defenses "to the end that we may be able to repel any and all threats against our national security and to fulfill our responsibilities in the efforts being made through the United Nations and otherwise to bring about lasting peace." The proclamation summons the support of the people. There has been no Presidential termination of the proclamation.

The Federal Sabotage Act, 18 U.S.C. § 2151 et seq., was passed in 1918 during World War I, 40 Stat. 533. As originally enacted, the statute applied only when the United States was at war. In 1940 § 2155 was added to make it a federal crime to sabotage the national defense in times of peace. 54 Stat. 1220. The penalties for peace-time violations under § 2155 are less than the penalties authorized by § 2153(a).

In 1952, realization that the long delayed signing of a peace treaty with Japan would invalidate various war and emergency statutes at a time when the country was engaged in the Korean conflict resulted in the Emergency Powers Continuation Act, 66 Stat. 54, which temporarily extended the viability of certain statutes, including the war-time penalties for violations of the Sabotage Act. After three additional short extensions, Congress in 1953 added § 2157 to the Sabotage Act. The amendment ex-

tended the applicability of the Act "until six months after the termination of the national emergency proclaimed by the President on December 16, 1950," unless sooner terminated by Congress. In 1954 the Act was amended, 68 Stat. 1216, 1217, to make § 2153 applicable "in times of national emergency as declared by the President or by the Congress" as well as in times of war.

In overruling defendant's motion to dismiss the indictment, the district court held that the 1950 proclamation was valid, had not been terminated, and was viable in 1969. At the trial the defendant offered, and the court rejected, the testimony of Prof. Adrian S. Fisher who as legal adviser of the State Department participated in the preparation of the 1950 proclamation. The offer of proof was in the form of extensive examination of Prof. Fisher on the stand out of the presence of the jury. In sum his testimony, if received, would have been that the facts underlying the 1950 proclamation "have ceased to exist."

■ Defendant argues that the continued existence of the proclamation is an element of the crime and, hence, a fact for determination by the jury. We disagree. Section 2153(a) says that the proscribed acts are forbidden "in times of national emergency." The reference is to the applicability of the statute. It is not one of the elements of the offense. Congress may predicate the operation of a statute upon a Presidential determination of a national emergency. See e. g. *Jolley v. Immigration and Naturalization Service*, 5 Cir., 441 F.2d 1245, 1254, cert. denied 404 U.S. 946, 92 S.Ct. 302, 30 L.Ed.2d 262, and *Nielsen v. Secretary of Treasury*, 137 U.S.App.D.C. 345, 424 F.2d 833, 837, both of which were concerned with the 1950 proclamation.

■ Defendant argues that § 2151, the definition section of the Sabotage Act, and § 2153 are void for vagueness. The vague terms are said to be "defense activities," "reason to believe," "national emergency," "preparing for," "war material," and "war premises." *United States v. Achtenberg*, 8 Cir., 459 F.2d 91, 95, cert. denied 409 U.S. 932, 93 S.Ct. 229, 34 L.Ed.2d 187, was con-

cerned with the same statutory provisions we have mentioned and held that the act is sufficiently clear to give fair notice to a normally intelligent person. We agree.

■ The fundamental issue is whether the 1950 proclamation may be used to apply the anti-sabotage provisions of § 2153(a) to offenses committed in 1969. Power of the President to declare a national emergency "should be implied from the aggregate of his powers under the Constitution." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587, 72 S.Ct. 863, 866, 96 L.Ed. 1153. The use of this power by Presidents is detailed in Gibson, The President's Inherent Emergency Powers, 12 Fed.B.J. 107. Although the power to proclaim is recognized, the power to terminate has evoked much discussion. The government contends that the duration of a given emergency is left exclusively to Presidential determination.

In recent years Congress has become concerned with Presidential emergency proclamations. The history and extent of the problem are comprehensively presented in S.Rep. No. 549, 93d Cong. 1st Sess. In its foreword the report notes the continued existence of our Presidentially declared national emergencies which give force to 470 provisions of Federal law. Ibid. at (III).

The 94th Congress gave further consideration to the matter. In its report on the bill which became the National Emergencies Act, Act of September 14, 1976, 90 Stat. 1255, the Senate Committee on Government Operations said, 3 U.S.Code Cong. & Adm. News '76, pp. 2288, 2295:

"The committee found that the whole field of emergency statutes and procedures was in disarray. Four emergency proclamations, issued in 1933, 1950, 1970, and 1971, had never been revoked; there was little historical guidance for declaring, administering, or terminating states of national emergency; and no current, comprehensive record of statutes effective during times of emergency existed."

The 1976 National Emergencies Act terminates all existing emergency proclama-

tions two years after the effective date of the act. Procedures are set up for review, and termination, of emergencies declared in the future. Section 202(d) of the Act, 90 Stat. at 1257, provides that:

"Any national emergency declared by the President in accordance with this title, and not otherwise previously terminated, shall terminate on the anniversary of the declaration of that emergency if, within the ninety-day period prior to each anniversary date, the President does not publish in the Federal Register and transmit to the Congress a notice stating that such emergency is to continue in effect after such anniversary."

When he signed the National Emergencies Act President Ford issued a statement in which he said that the termination of a national emergency by a concurrent resolution of Congress is unconstitutional because of violation of the doctrine of separation of powers and because Art. I, Section 7 of the Constitution requires that resolutions having the force of law be sent to the President for signature or veto. See Weekly Compilation of Presidential Documents, Vol. 12, No. 38, p. 1340, Sept. 14 Presidential Statement. A 1954 federal case concurs with the President's statement. See *Werner v. United States*, 119 F.Supp. 894, S.D.Cal. aff'd on different grounds, 9 Cir., 233 F.2d 52, cert. denied 352 U.S. 842, 77 S.Ct. 65, 1 L.Ed.2d 58. The President said that he signed the bill because he considered § 202(a)(1), authorizing termination by concurrent resolution of Congress, to be separable from the remainder of the bill.

The use of the 1950 proclamation by the President has not been entirely consistent. Its continuing validity was recognized in his 1953 Presidential Proclamation No. 3004, 18 Fed.Reg. 489, in his 1960 Executive Order No. 10896, 25 Fed.Reg. 12281, and in his 1961 Executive Order No. 10905, 26 Fed. Reg. 321. In spite of the provisions of 10 U.S.C. § 712 authorizing the President to assign troops abroad in times of national emergency, the President went to Congress for authority to put troops on the alert and to send troops abroad when crises occurred in Formosa (see 69 Stat. 7), the Suez (see 71 Stat. 5); and the Gulf of Tonkin (see 78 Stat. 384).

Congress recognized the continuing validity of the 1950 proclamation by its 1953 action providing that § 2153 shall be effective for six months after the termination of the emergency declared in 1950. See 67 Stat. 133, 18 U.S.C. § 2157. The title of that Act, "Temporary Extension of Sections 2153 and 2154," suggests that Congress did not intend the provisions of § 2153 to apply on a quasi-permanent basis because of the 1950 proclamation.

The legislative history of the National Emergencies Act does not show that Congress considered the facts justifying the 1950 emergency to be still existent. S.Rep. No. 549, 93d Cong. 1st Sess. says at p. (III):

"[T]here is no present need for the United States Government to continue to function under emergency conditions."

S.Rep. No. 1168, 94th Cong. 2d Sess.; U.S.Code Cong. & Admin.News 1976, p. 2288, says that passage of the bill which became the National Emergencies Act would assure that the extraordinary powers of the President "could be utilized only when emergencies actually exist," and that, Ibid. at p. 2; U.S.Code Cong. & Admin. News, 1976, p. 2289:

"Reliance on emergency authority, intended for use in crisis situations would no longer be available in noncrisis situations."

The same report says, Ibid. at 10; U.S.Code Cong. & Admin.News 1976, p. 2296, that: "A 2-year delay in the effective date of termination of emergency powers and authorities is designed to allow time to enact permanent law where needed." The 1976 action of Congress recognizes the 1950 proclamation but does not recognize the continued existence of the facts used to support it.

The government argues that the executive and legislative branches of the government have not terminated the proclaimed 1950 emergency, and that under the doctrine of separation of powers, no justiciable controversy is presented. In various factu-

al situations a number of cases have upheld the continuing viability of the 1950 proclamation. See *Sardino v. Federal Reserve Bank of New York,* 2 Cir., 361 F.2d 106 (1966), cert. denied 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130; *Teague v. Regional Commissioner of Customs, Region II,* 2 Cir., 404 F.2d 441 (1968), cert. denied 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969); *Nielsen v. Secretary of Treasury,* 137 U.S. App.D.C. 345, 424 F.2d 833 (1970); *Jolley v. Immigration and Naturalization Service,* 5 Cir., 441 F.2d 1245, cert. denied 404 U.S. 946, 92 S.Ct. 302, 30 L.Ed.2d 262 (1971) and *McEwan v. Rusk,* E.D.Pa., 228 F.Supp. 306 (1964), aff'd *per curiam,* 3 Cir., 344 F.2d 963 (1965). In *United States v. Achtenberg,* 8 Cir., 459 F.2d 91, cert. denied 409 U.S. 932, 93 S.Ct. 229, 34 L.Ed.2d 187 (1972), the court was concerned with a criminal prosecution under § 2153(a). The court, noting the absence of Presidential or Congressional termination, declined to consider the viability of the 1950 proclamation and reversed the conviction because of trial errors. None of the cited cases, except *McEwan v. Rusk,* mentions either of two pertinent Supreme Court decisions.

*Chastleton Corporation v. Sinclair,* 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841, was an action to restrain the enforcement of an order of the Rent Commission of the District of Columbia. The Commission acted under the 1919 Rent Act, 41 Stat. 297 and 42 Stat. 543, which Congress declared "necessary by emergencies growing out of the war." See *Block v. Hirsh,* 256 U.S. 135, 154, 41 S.Ct. 458, 459, 65 L.Ed. 865. The Court remanded the case for the ascertainment of the facts pertaining to the continuation of the emergency. 264 U.S. at 549, 44 S.Ct. 405. In so doing the Court said, 264 U.S. at 547–548, 44 S.Ct. at 406:

"[A] Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared. . . . [It can] inquire whether the exigency still existed upon which the continued operation of the law depended."

*McEwan v. Rusk* notes a portion of the above quoted statement from *Chastleton* and says that the 1950 proclaimed emergency had not ended. See 228 F.Supp. at 312–313.

*Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, was concerned with whether an action attacking the apportionment of a state legislature presented a nonjusticiable political question. *Ibid.* at 208–209, 82 S.Ct. 691. In discussing political questions arising in the context of foreign relations, the Court says that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Ibid.* at 211, 82 S.Ct. at 707. The Court goes on to say, *Ibid.* at 211–212, 82 S.Ct. at 707, that:

"Our cases in this field [foreign relations] seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action."

If President Ford was correct in his position that the provision of the National Emergencies Act for termination of an emergency by act of Congress is unconstitutional and, if the government is correct in the position which it takes in the instant case that the judiciary may not terminate an emergency, the awesome power of the President to declare an emergency and thereby activate 470 federal laws is unfettered. In his article Ending Emergency Government, A.B.A.J. Vol. 63, p. 197, Senator Church refers to the power as "[a]n insidious threat to constitutional government in this country [that] has gone all but unnoticed." *Ibid.* at 197. With all regard to separation of powers it seems clear that the indefinite prolongation of an emergency by presidential non-action long after the causative facts have ceased to exist is antithetical to our system of checks and balances and could present a serious threat to the concept of limited executive power.

In the case at bar, it is not necessary to take the extreme step of holding that the

1950 proclamation was not viable in 1969 for any purpose. *Baker v. Carr* discusses the justiciability of political questions arising in the field of foreign relations. 369 U.S. at 211–214, 82 S.Ct. 691. The decision says that the question should be analyzed with regard to its susceptibility to judicial handling in a particular case and to the possible consequences of judicial action.

The defendant could have been prosecuted under § 2155 proscribing sabotage at any time. The government chose to invoke the more severe § 2153(a) which applies in times of national emergency, and in so doing relied on the 1950 proclamation. The question then is whether that proclamation, when applied to § 2153(a), gives fair notice to the defendant.

■■■ The sufficiency of the notice is susceptible to judicial determination and effects the consequences of the action. Consideration of notice from a constitutional standpoint does not infringe on the doctrine of separation of powers. The judicially recognized test is whether a person of ordinary intelligence is given fair notice that contemplated conduct is forbidden. *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989. See also *Palmer v. City of Euclid,* 402 U.S. 544, 545, 91 S.Ct. 1563, 29 L.Ed.2d 98, and *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322.

The justification for the 1950 proclamation was the Korean conflict and communist aggression. Korean hostilities ended in the Panmunjon Armistice of July 27, 1953. The 1969 viability of the proclamation depends on "communist aggression." The reliance of the government on the Vietnam situation existing in 1969 is not impressive. We know of no national emergency which was proclaimed because of the Vietnam crisis. The indictment does not charge that the United States was at war in 1969.

■■■ The term "communist aggression" is vague. The imperialistic ambitions of the Soviet Union may be recognized. Its ideology conflicts with that of the United States. The position of the United States is such that daily occurrences around the globe affect it in varying degrees. A national emergency must be based on conditions beyond the ordinary. Otherwise it has no meaning. The power of the Soviet Union in world affairs does not justify placing the United States in a constant state of national emergency.

■■■ Fair notice must be based on something more than visionary theorizing on world conditions. The applicability of the 18-year old proclamation to a 1969 offense may not be predicated on an individual's appraisal of then existing world conditions. Reasonable men of ordinary intelligence may well differ on whether the unexplicit phrase "communist aggression" as used in the 1950 proclamation had continuing pertinence in 1969.

■■■ In *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 425, 54 S.Ct. 231, 235, 78 L.Ed. 413, the Court said:

"Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions upon power granted or reserved."

The Court went on to say that "even the war power does not remove constitutional limitations safeguarding essential liberties." *Ibid.* at 426, 54 S.Ct. at 235. Likewise, the power to declare a national emergency does not destroy the Fifth Amendment requirement of due process.

■■■ The 1950 proclamation did not give the defendant fair notice that his conduct was proscribed by § 2153(a). The only other Presidential proclamation, of which we are aware, that might apply to permit the application of § 2153 is the 1933 proclamation of an emergency arising out of domestic economic affairs. See Act of March 9, 1933, 48 Stat. 1. What we have said about the 1950 proclamation suffices to dispose of the 1933 proclamation. The prosecution fails because it was brought under the wrong statute.

Our conclusion that the defendant did not have the constitutionally required notice makes it unnecessary for us to consider the trial errors claimed by defendant.

Reversed and remanded with direction to dismiss the indictment.