**YUICHI INOUYE et al. v. CLARK et al.**
**No. 5945–W.**

District Court, S. D. California,
Central Division.

Sept. 5, 1947.

A. L. Wirin and Fred Okrand, both of Los Angeles, Cal., for plaintiffs.

James M. Carter, U. S. Atty., and Ronald Walker, Asst. U. S. Atty., both of Los Angeles, Cal., for defendants.

CAVANAH, District Judge.

The plaintiffs of Japanese ancestry born in the United States and residents of the State of California bring this action to cancel and declare null and void their renunciations of citizenship made by them when they were confined and detained in Relocation Centers, with a large number of Japanese who are not citizens of the United States during the period of the war.

They claim to be citizens and nationals of the United States by birth and assert that their renunciations were not of their free and voluntary act but were the result of undue influence, mistake, duress and coercion. Jurisdiction is vested by Section 903, Title 8 U.S.C.A., wherein it is provided that any person who claims a right or privilege as a national of the United States is denied such right by any department or agency upon the ground that he is not a national of the United States, may institute an action in a District Court of the United States for a decree declaring him to be a national of the United States.

The applications for renunciations were made under Section 801 of the Nationality Act of 1940, authorizing them to be made in compliance with law.

The case, under stipulation, is before the court upon the merits and the record consists of the pleading and affidavits filed by the parties.

■ When considering the case, we must keep in mind that each of the plaintiffs' rights are to be considered and determined separately and according to the facts pertaining to them. While the question of whether the government had the power to confine the plaintiffs in the Relocation Centers is not presented, yet it seems pertinent to consider the decision of the Supreme Court in the case of Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243, a Japanese, claiming citizenship by birth in the United States, as relating to the situation of the plaintiffs were in and their conduct before and after confined in the Relocation Centers, upon the thought as to whether they were loyal abiding citizens or violating any laws before and at the time of their applications for renunciations, or it was for the protection of the war effort against espionage and sabotage, as bearing upon their state of mind as to duress and coercion, as the Supreme Court held that the War Relocation Authority is without authority to subject to its leave procedure loyal and abiding citizens of the United States, as the purpose of the law was the protection of the effort against espionage and sabotage and there is no basis for keeping loyal evacuees of Japanese ancestry in custody on the ground of community hostility.

The record here presents no problem of disloyalty, violations of law, or espionage and sabotage, and when not, their confinement is repugnant to the basis of liberty, and should be considered only as to whether

the fundamental principles of law are applicable as to age, mistake, duress or coercion existed which dominated and influenced their minds in not acting freely and voluntarily at the time the plaintiffs made their applications for renunciations. This is the primary thought to be considered in the present case.

The inquiry then is, under the record relating to these plaintiffs, what are the facts relating to each of them separately and the situation existing at the Center?

The plaintiff, Albert Yuichi Inouye, was a young boy of the age of seventeen years at the time he signed his application for renunciation and born in the United States: His parents were of Japanese ancestry and subject to being deported. He was the only son and had never been in Japan or had any feeling of loyalty to that country. He was with his family when they were evacuated from Los Angeles to the Manzanar Relocation Center in California and thereafter transferred to Santa Fe Detention Center, New Mexico, where he remained until his release. He was not disloyal to the United States or violated any law or performed any act or conduct that could be considered espionage and sabotage. Prior to his evacuation he attended the public schools and was active in the Christian Church, Y.M.C.A. athletics, participated in the contribution to the drives for infantile paralysis, tuberculosis, waste paper and purchased war savings stamps. While at the Relocation Center he was active in the American Red Cross project and went to school there. While seventeen years of age in March, 1945, he applied for renunciation and signed the application form furnished by the Department of Justice on July 9, 1945, and withdrew his renunciation on August 23, 1945, which was of no avail. While at the Relocation Center he was accorded another hearing and after proof of his loyalty to the United States had been evident was released in April, 1946. Soon after his release from the Center he volunteered for the United States Army, was ordered to report for overseas duty on November 2, 1946, and on November 16, 1946 for Military Intelligence school where he is presently stationed.

At the hearing before the government agent and what had occurred before, it appears clear that the youth yielded to parental compulsion and a clear case of "parental influence" in order to hold the family intact. In his application to withdraw his renunciation, he states that his renunciation was done under mistake and influence, not his free will and that he was a minor.

Two thoughts are presented relating to his renunciation: First, can one born in and a national of the United States legally renounce his citizenship at the age of seventeen years? Section 801 of the Nationality Act of 1940 is silent as to the age when a person may renounce his citizenship. A minor being one under the age of twenty-one cannot, by his activities, be legally deprived of his civil rights but the defendants contend that as Section 803 of the Nationality Act of 1940, provides that no national under eighteen years of age can expatriate himself under Subsection (b) to (g) inclusive, Section 803 requirement of eighteen years should apply to Subsection (i) of Section 801. It will be observed that both Section 801(i), under which the renunciations were made, and Section 803 were enacted at the same time and no mention as to age is made in Section 801, at which a person who is a national of the United States by birth shall lose his nationality, and the mere fact that a national eighteen years of age can expatriate himself under Section 803 was only to lower the age at which expatriation could be affected except under Section 801, as Section 803(a) enacted at the same time as Section 801(a) states "except as provided in subsections (g), (h), and (i) of section 801, no national can expatriate himself, or be expatriated, under this section while within the United States or any of its outlying possessions." Therefore, Section 803 does not apply as it relates to different instances than the provisions of the Act under which these renunciations were made when applied to the general principle requiring one to have reached his majority. The requirement of age which renunciation of citizenship can be made should not be left to conjecture in face of Congressional silence and the rights of citizenship are not to be de-

stroyed by ambiguity. Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320.

■■ Furthermore, these plaintiffs have not expatriated themselves. To constitute an expatriation there must be an actual removal from the country of which the individual is a citizen or a subject, made voluntarily by a person of full age.

The Fourteenth Amendment of the Constitution declares: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." In Ex parte Chin King, 35 F. 354, 356, where a child born in the United States of Chinese parents was an American citizen and his status thus acquired under the Constitution of American citizenship "can only be lost or changed by the act of the party when arrived at majority, and the consent of the government."

In the case of United States ex rel. Baglivo v. Day, D.C., 28 F.2d 44, it appears that Baglivo born in the United States was excluded as an alien not in possession of an immigration visa who went to Italy and endeavored to return and while in Italy he was in the Italian Military Service. The court held that: "A native-born citizen, who has not attained the age of 21 years, cannot renounce allegiance to the United States."

Therefore, at the time the plaintiff Albert Yuichi Inouye signed his application and its approval by the government, he, being under the legal age the same is void.

■ The second thought of his claim, being under "parental influence" and was not acting of his own free will and act, brings his status under the principle that where acts of a child done under the domination of the parent and which dominates the mind of the minor by unfair persuasion, it is regarded as induced by unfair persuasion and influence of the minor and is voidable, but it is asserted by the defendants that at the time he signed his application he wanted to go to Japan with his parents, who were subject to deportation. This expression of a boy of the age of seventeen is a natural one not to be separated from his family who was going to a foreign and distant country, if we consider the force and control of human nature and its depressing effects. The results flowing from that parental domination and the acts of fear constitute undue influence, duress and coercion, require them to be declared null and void. They should be considered in the light of the circumstances under which they were performed. Feebleness on one side and overpowering strength on the other imply duress.

■ We come to the consideration of the other plaintiffs, who were evacuated and confined in Tule Lake Center in California. They were young people when they signed their application for renunciation. The plaintiff, Miye Mae Murakami, born in California, when she signed her application for renunciation was married to her present husband in September, 1939, a Japanese alien, and was evacuated with her family in April, 1942. In February, 1944 she was sent to the Tule Lake Center under the "segregation program" and as a result of her husband having applied for repatriation and reports and statements uttered to her that all American citizens and Japanese aliens would be segregated into different camps regardless of age or marriage. Feeling that it was not necessary to be separated from her husband and in fear of being assaulted unless she did so renounce her citizenship, the strong arm and tactics used by the gang of young disloyal Japanese at Tule Lake Center which kept the ward where she was living in constant state of tension, hysteria and fear, and reports of assaults, stabbings in the dark, compelled her for her own safety and welfare to renounce her citizenship.

The plaintiff, Tsutako Sumi, born in California, married a Japanese alien and is the mother of three children. She and her husband were evacuated in April, 1942, and sent to the Tule Lake Center. After her husband had applied for repatriation, she applied for renunciation and was released in October, 1945, from Tule Lake Center. She lived in a block at Tule Lake Center where the rabid pro-Japanese elements were and she lived in a daily atmosphere of fear and threats. Her husband was forced by the pro-Japanese elements to

have her renounce her citizenship, which he did by coercion against her will.

The plaintiff, Mutsu Shimizu, born in California, was married in 1938 to a Japanese alien. She and her family were evacuated in 1942 and confined in Tule Lake Center. She is the mother of three children born in the United States. She renounced her citizenship which was approved in October, 1945. Thereafter, she was ordered released from the Center. She says the reason she renounced her citizenship was because of pressure and influence aggravated by threats, killings, stabbings imposed upon those who did not renounce. Her husband was an active leader in the pro-Japanese group. Her brothers and relatives had assisted the United States during the war. She states that she did not want to renounce her citizenship.

The War Relocation Authority found that each of the plaintiffs were free of any suspicion of disloyalty to the United States.

We are confronted with the situation at Tule Lake Center where three of the plaintiffs were confined prior to and at the time they made their renunciation. A high degree of excitement and mass hysteria existed. Two groups of Japanese existed, one consisting of Japanese born in the United States and who were not disloyal and guilty of espionage and sabotage or violation of any law, and one consisting of those who were not citizens and pro-Japanese belonging to terror groups of violent activities of assaults, beatings, threats of murder and murder of those Japanese who opposed their policies and activities and who were in danger of physical violence. Those Japanese who spoke against the pro-Japanese were brutally assaulted causing them to be in mental fear, intimidation and coercion when they applied for their renunciation, is clearly revealed by the affidavits and which were the primary and controlling factors in divesting them of their citizenship. Such persons should not be held responsible for their action as it was not their full and voluntary will.

The modern view and true doctrine of duress and coercion is to be tested which results from threats and fear of actual or apparent physical injury or violence producing a state of mind of the injured party is the ultimate fact of whether such person was deprived of the free exercise of his will power. Freedom of will is essential in the exercise of an act which is urged to be binding, and the right of citizenship being an important civil one can only be waived as the result of free and intelligent choice. The mere fact that some of the plaintiffs having stated that they knew the results of their renunciations does not remove the primary force and effect of duress, coercion and undue influence that caused them to renounce.

For the reasons thus stated, the results of the plaintiffs' renunciations having been made under undue influence, duress and coercion and not of their free will and act, and the further thought as to the plaintiff, Albert Yuichi Inouye, not being competent of legal age at the time he made his application for renunciation, who also acted under undue influence, duress and coercion, their renunciations are declared to be null and void and cancelled and they are restored to their rights of citizenship.