**Thomas Glenn JOLLEY, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 29987.**

United States Court of Appeals,
Fifth Circuit.

April 12, 1971.

Rives, Circuit Judge, dissented.

Peter E. Rindskopf, Howard Moore, Jr., Atlanta, Ga., for petitioner.

R. William Foley, District Director, U. S. Immigration and Naturalization Service, John W. Stokes, Jr., U. S. Atty., Beverly B. Bates, Asst. U. S. Atty., Atlanta, Ga., for respondent.

Before RIVES, GOLDBERG, and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

A renunciant of United States citizenship, who took refuge in Canada to avoid the Selective Service System, resists deportation after his unannounced, unheralded, and surreptitious reentry to this country. Though some of the pieces in the mosaic of our immigration and nationality laws permit beneficent toleration in their exceptions, we find no piece that fits the contours of petitioner's flight. The Board of Immigration Appeals ordered deportation, and we affirm.

I.

Petitioner, Thomas Glenn Jolley, was born in Greensboro, North Carolina, on January 26, 1944. Upon reaching the age of eighteen he registered with Selective Service System Local Board 75 in Bremen, Georgia, and subsequently was placed in category II–S (student deferment) by reason of his attendance at the University of Georgia. In January or February, 1967, Jolley left school and went to Canada. From Toronto, on March 5, 1967, Jolley wrote his Local Board informing it of his change in status and residence, and requesting that he be placed in category I–O (conscientious objector). On April 17, 1967, he was placed in class I–A (available for induction). Thereafter, on May 16, 1967, Jolley went before the United States Consul in Toronto and stated: "I do not wish to break the laws of the United States. These laws (Selective Service) conflict with my beliefs." Jolley then formally executed an Oath of Renunciation of United States citizenship. On May 17, 1967, he returned to his Local Board his Selective Service Registration Certificate and Notice of Classification, together with the following statement:

"The enclosed cards are yours. I have no further use for them. Yesterday, May 16, I renounced my United States citizenship, thus terminating all obligations to the United States. I say 'obligations' with tongue in cheek because my concept of an obligation and yours are miles apart, several hundred in fact."

On June 13, 1967, and again on August 7, 1967, Jolley was ordered to report for induction, but he failed to do so on both

occasions. Thereafter, some time prior to March 19, 1968, Jolley returned to the United States without a visa. The record does not reveal his method of re-entry.

Deportation proceedings were commenced against Jolley on March 20, 1968, under Immigration and Nationality Act § 241(a) (1), 8 U.S.C.A. § 1251(a) (1),[1] as an alien excludable at the time of entry. Supporting this charge the Government contended that Jolley, having renounced his United States citizenship, was an alien who was excludable because (1) he entered the United States without an immigrant visa,[2] and (2) he was a person who departed from or remained outside the United States to avoid or evade training in the armed services in time of war or national emergency.[3]

A hearing was held before a Special Inquiry Officer pursuant to Immigration and Nationality Act § 242(b), 8 U.S.C.A. § 1252(b). That officer found that petitioner was an alien excludable for entering the country without an immigrant visa and for remaining outside the country to avoid military service. Petitioner was ordered to depart voluntarily within 90 days or be deported to Canada. Jolley then appealed to the Board of Immigration Appeals pursuant to 8 C.F.R. § 242.21, challenging the findings of alienage and of excludability. The Board, following oral argument, affirmed the decision and order of the Special Inquiry Officer. Jolley now petitions for review in this court under Immigration and Nationality Act § 106(a), 8 U.S.C.A. § 1105a.[4]

## II.

■■ In order for petitioner, a United States citizen by virtue of his birth, to be subject to deportation the Government must demonstrate that he has lost his United States citizenship through expatriation and assumed the status of an alien. Moreover, because of the precious nature of citizenship, it can be relinquished only voluntarily, and not by legislative fiat. Afroyim v. Rusk, 1967, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed. 757; *see* United States v. Wong Kim Ark, 1898, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890; Kennedy v. Mendoza-Mar-

1. This section provides:
 "(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—
 (1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry;"

2. Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182, sets forth those classes of aliens excludable by law. Section 212(a) (20), 8 U.S.C.A. § 1182(a) (20), provides:
 "(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:
 * * * * *
 (20) Except as otherwise specifically provided in this chapter, any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid un-expired passport, or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General pursuant to section 1181(a) of this title;"

3. Immigration and Nationality Act § 212 (a) (22), 8 U.S.C.A. § 1182(a) (22), requires the exclusion of:
 "Aliens who are ineligible to citizenship, except aliens seeking to enter as nonimmigrants; or persons who have departed from or who have remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency, except aliens who were at the time of such departure nonimmigrant aliens and who seek to reenter the United States as nonimmigrants;"

4. The record reveals that in addition to deportation charges, Jolley was criminally charged with violation of the Selective Service laws under 50 U.S.C.A. App. § 462(a). The charges, however, were subsequently dismissed.

tinez, 1963, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644. It is precisely this point to which petitioner directs his main argument, for he contends that his expatriating act was involuntary.[5] While admitting that he executed a formal, unequivocal renunciation of citizenship before a United States Consul in Canada,[6] Jolley argues that his renunciation was made under duress. The coercion, according to petitioner, was his desire to avoid breaking the Selective Service laws of the United States.

Most of the cases concerning duress have involved those sections of the Immigration and Nationality Act which have declared that the loss of United States citizenship shall result from speci-fied conduct,[7] such as voting in a foreign election or serving in a foreign army. Prior to the decision in Afroyim v. Rusk, *supra*, which held that expatriation could be accomplished only by voluntarily relinquishing citizenship and not simply by engaging in proscribed conduct,[8] the Supreme Court had ruled that the legislatively-defined conduct set forth in the Act could result in expatriation only if the actor engaged in the conduct voluntarily. Since the instant case involves an explicit renunciation, not a renunciation by inference or by legislative command, we face the precise question raised in those earlier cases: whether or not Jolley's expatriating act was voluntary. In such an inquiry, therefore, those earlier cases remain instructive.[9]

5. Since Jolley claims that he is a national of the United States, he suggests that we transfer the proceedings to a federal district court for an evidentiary hearing on that issue pursuant to Immigration and Nationality Act § 106(a) (5), 8 U.S.C.A. § 1105a (a) (5). That section provides:

"Whenever any petitioner, who seeks review of an order under this section, claims to be a national of the United States and makes a showing that his claim is not frivolous, the court shall (A) pass upon the issues presented when it appears from the pleadings and affidavits filed by the parties that no genuine issue of material fact is presented; or (B) where a genuine issue of material fact as to the petitioner's nationality is presented, transfer the proceedings to a United States district court for the district where the petitioner has his residence for hearing de novo of the nationality claim and determination as if such proceedings were originally initiated in the district court under the provisions of section 2201 of Title 28. Any such petitioner shall not be entitled to have such issues determined under section 1503(a) of this title or otherwise."

We decline petitioner's invitation, for we find that with regard to nationality "no genuine issue of material fact is presented." This finding also disposes of petitioner's argument that 8 U.S.C.A. § 1481 (c), which places the burden of demonstrating the involuntariness of an expatriating act upon the petitioner, is unconstitutional in light of Supreme Court decisions such as Woodby v. Immigration & Naturalization Service, 1966, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362, Nishikawa v. Dulles, 1958, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659, and Afroyim v. Rusk, supra. Since the facts are undisputed the presumption is inapplicable, and the question of voluntariness must be decided as a matter of law.

6. Recognizing that a citizen has a right to renounce his citizenship, Congress has provided in 8 U.S.C.A. § 1481(a) (6) formal procedures for doing so. Jolley's renunciation satisfied these procedures.

7. The grounds for expatriation are set forth in 8 U.S.C.A. § 1481. See also 8 U.S.C.A. §§ 1482–1489.

8. In *Afroyim* the Court characterized its holding as follows:
"We hold that the Fourteenth Amendment was designed to, and does, protect every citizen of this Nation against a congressional forcible destruction of his citizenship, whatever his creed, color, or race. Our holding does no more than to give to this citizen that which is his own, a constitutional right to remain a citizen in a free country unless he voluntarily relinquishes that citizenship." 387 U.S at 268, 87 S.Ct. at 1668.

9. *Afroyim* leaves open the question of when a citizen "voluntarily relinquishes" his citizenship. Thus, it is not clear whether certain conduct short of formal renunciation can impliedly result in assent to loss of nationality. For example, is the obtaining of naturalization in a foreign state, as provided in 8 U.S.C.A. § 1481(a) (1), so inconsistent with the

In Nishikawa v. Dulles, *supra*, the Court held that conscription of a dual national into the Japanese Army during World War II did not automatically result in expatriation despite explicit statutory language, see 8 U.S.C.A. § 1481 (a) (3), for Japanese penal sanctions to which the national was subject rendered the service in the foreign army involuntary. *See also* Takehara v. Dulles, 9 Cir. 1953, 205 F.2d 560; Takano v. Dulles, D. Hawaii 1953, 116 F.Supp. 307 [voting in foreign election motivated by fear of loss of ration cards involuntary and not expatriating under 8 U.S.C.A. § 1481(a) (5)]; Acheson v. Murakami, 9 Cir. 1949, 176 F.2d 953; Inouye v. Clark, S.D.Cal. 1947, 73 F.Supp. 1000, rev'd on other grounds, 9 Cir. 1949, 175 F.2d 740 [decisions to renounce United States citizenship by Japanese-Americans confined at Tule Lake detention center during World War II held not the product of sober choice but rather the result of force and violence, conditions characteristic of detention center.]

Petitioner, of course, points out the surface similarity of *Nishikawa* to the instant case, for it is petitioner's contention that his expatriating act was also the product of a conscription law with penal sanctions. We disagree with the force of this analogy. Nishikawa was faced with the choice of either subjecting himself to Japanese penal sanctions or relinquishing his United States citizenship. The conflicting laws of the United States and Japan created a Hobson's choice which rendered either alternative involuntary. The same dilemma did not confront Jolley. While we accept the assertion that Jolley's abhorrence of the Selective Service laws caused him to apostatize himself, he cannot equate that abhorrence with coercion sufficient to render his renunciation involuntary as a matter of law. Dislike for the law does not in and of itself compose coercion; subjective detestation cannot be metamorphosed into duress. Jolley's Hobson's choice, if it be deemed such, was self-generated. The compulsion he felt to renounce his citizenship was of his own design. But opportunity to make a decision based upon personal choice is the essence of voluntariness. Such a choice was unavailable to Nishikawa, for he was forced by Japanese penal law to engage in what was then termed an expatriating act. The duress he felt was not of his own making. Jolley's expatriating act, on the other hand, was not compelled by law. He had the alternative to obey the dictates of the Selective Service System, an alternative he found impossible solely because of his own moral code. His renunciation was therefore the product of personal choice and consequently voluntary.[10]

retention of United States citizenship that renunciation can properly be implied? Compare The Supreme Court, 1966 Term, 81 Harv.L.Rev. 69, 126 (1967), with Trop v. Dulles, 1958, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630, Kennedy v. Mendoza-Martinez, supra, and Schneider v. Rusk, 1964, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218. The instant case, of course, does not pose such a problem, for Jolley's renunciation on its face was unequivocal. The question simply becomes whether or not his renunciation was free and uncoerced.

10. This conclusion is even more manifest in light of analogous decisions which have considered claims of duress by aliens barred from citizenship because they sought exemption from military service. See 50 U.S.C.A. App. § 454(a); 8 U.S.C.A. § 1426. Pressures beyond moral considerations, such as fear of retaliation or financial burden, have been rejected as sufficient grounds upon which to posit duress. E. g., Prieto v. United States, 5 Cir. 1961, 289 F.2d 12; Jubran v. United States, 5 Cir. 1958, 255 F.2d 81; Petition of Skender, 2 Cir. 1957, 248 F.2d 92, cert. denied, 355 U.S. 931, 78 S.Ct. 411, 2 L.Ed.2d 413; Savoretti v. Small, 5 Cir. 1957, 244 F.2d 292. In each case "it was concluded that the alien had a free choice, that he chose to forego military service and must endure the consequences, and that there was no coercion in contemplation of law. The mere difficulty of this choice is not deemed to constitute duress. If the alien made a free and deliberate choice to accept benefits, he will be bound by his election." Gordon & Rosenfield, Immigration Law & Procedure, § 2.49d, at 2–239 (1970).

█ Implicit in Jolley's argument is the proposition that a detrimental result, such as the loss of citizenship, should not flow from an act dictated by conscience. In our society, however, commands of conscience, absent statutory or constitutional recognition, cannot be accorded para-legal status.[11] While we comprehend Jolley's argument and contention concerning his plight, so long as the draft remains a valid obligation of citizenship, it cannot constitute legal duress. Jolley chose to avoid what he considered a nefarious burden of citizenship. Having exercised this choice, Jolley may not be relieved of the consequences flowing from it. We therefore hold that petitioner's renunciation of his United States citizenship was voluntary and that he must be treated as an alien for purposes of judging the validity of the deportation order.

### III.

Petitioner next argues that even if he be deemed to have voluntarily renounced his citizenship, thus becoming an alien, he may not be deported because of Immigration and Nationality Act § 241(f), 8 U.S.C.A. § 1251(f). That section provides that an alien married to a United States citizen and "otherwise admissible at time of entry" shall not be deported for gaining entry to this country by misrepresentation or fraud:

"The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien other-

wise admissible at the time of entry who is the spouse, parent, or a child of a United States citizen or of an alien lawfully admitted for permanent residence."

Since it is admitted that Jolley is married to a United States citizen—and was so married at the time of his reentry—he contends that the section is clearly applicable.

Our inquiry must begin with the seminal decision of Immigration & Naturalization Service v. Errico, 1966, 385 U.S. 214, 87 S.Ct. 473, 17 L.Ed.2d 318. There petitioners had made misrepresentations before the immigration authorities in order to gain immigrant status despite quota restrictions. Subsequent to entry, petitioners established familial relations with United States citizens. In contesting deportation proceedings brought against them as aliens excludable at time of entry under section 241(a) (1), 8 U.S.C.A. § 1251(a) (1), because not of the quota specified in their immigrant visas, section 211(a), 8 U.S.C.A. § 1181 (a), the petitioners claimed relief under section 241(f). The lower courts reached differing results, and the Supreme Court granted certiorari.

The Court first rejected the argument that section 241(f) must be applied literally to afford relief only when deportation is predicated on Immigration and Nationality Act § 212(a) (19), 8 U.S.C.A. § 1182(a) (19), the general fraud section.[12] Rather, section 241(f) was deemed to waive "any deportation charge that results directly from the misrepresentation regardless of the section under which the charge was brought, provided that the alien was 'otherwise admissible at the time of entry.'" 385 U.S. at 217, 87 S.Ct. at 476.[13] Thus, the fact that in

---

11. In some instances, of course, moral imperatives have been given explicit legislative recognition. See 50 U.S.C.A. App. § 456(j), as construed in Welsh v. United States, 1970, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (conscientious objector).

12. Section 241(f), on its face, would apply only when the Government seeks to expel an alien on the ground that he was excludable at entry for having "procured

a visa or other documentation * * * by fraud, or by willfully misrepresenting a material fact." 8 U.S.C.A. § 1182(a) (19).

13. Section 241, 8 U.S.C.A. § 1251, sets forth the grounds for deportation. That section in turn refers to other sections of the Act, including section 212, 8 U.S.C.A. § 1182, which specifies certain classes of aliens excludable at time of entry.

*Errico* deportation charges had been brought not for misrepresentation, but for quota violations, was irrelevant, since the evasion of the quota restrictions flowed from the fraud. The crucial question was whether or not petitioners who had evaded quota restrictions were "otherwise admissible." Analyzing the legislative history and noting the congressional goal of preserving family ties, the Court held that quota evasion did not prevent petitioners from being "otherwise admissible."

In the instant case the Government lodges two basic objections to granting relief under section 241(f). First, pointing to the fact that Jolley never demonstrated that he fraudulently obtained an immigrant visa, the Government argues that section 241(f) is completely inapplicable. That section, the Government contends, applies only to deportation charges directly resulting from misrepresentations made during the immigrant visa-issuing process. Since Jolley never submitted himself to that process,[14] the lodged charge—entry without a visa—did not directly result from fraud within the meaning of the section. Secondly, the Government contends that even if Jolley's mode of entry does not render section 241(f) inapplicable, he is not "otherwise admissible," for he is excludable on the ground of evading military service. *See* section 212(a) (22), 8 U.S.C.A. § 1182(a) (22).

In response, Jolley first contends that he cannot be barred from the relief provided by section 241(f) simply because he did not obtain a visa by fraud. His argument can best be summarized by quoting from his brief:

"Although the Government has established no fraud in the application for a visa on petitioner's part, it cannot deny to him the benefits of *Errico* pure and simple. The Government cannot,

consistant [sic] with due process, condition statutory rights on the performance of a criminal act, such as fraudulent application for a visa. Since petitioner is in the country, with or without the visa that got Errico in illegally, he is entitled to similar benefits. Not even Errico could have been heard to claim that his visa was, since it was obtained through fraud, entitled to any legal standing. The Supreme Court's decision in *Errico* is bottomed upon a clear Congressional desire not to break up families of which United States citizens are a part. The family of the petitioner is such a family. * * * [H]aving a fraudulent *Errico* visa is qualitatively the same as no visa at all."

We decline to resolve this first issue, which raises difficult problems of statutory construction,[15] for we find that petitioner is ineligible for relief since he is not "otherwise admissible" within the meaning of section 241(f).

While the Supreme Court in *Errico* held that failure to meet quota restrictions could not bar an alien from being "otherwise admissible," the Court did not precisely delineate the scope of that concept. However, subsequent cases have held that the phrase refers to the various non-quota, qualitative grounds for exclusion or deportation detailed in the Act. In deVargas v. Immigration & Naturalization Service, 5 Cir. 1968, 409 F.2d 335, cert. denied, 396 U.S. 895, 90 S.Ct. 192, 24 L.Ed.2d 172, we held that an alien who misrepresented that she had been previously deported [a ground for exclusion and consequently deportation under section 212(a) (17), 8 U.S.C.A. § 1182(a) (17), absent permission to reenter by the Attorney General] was not "otherwise admissible" under section 241 (f):

14. The record does not reveal Jolley's precise mode of reentry into the United States. By inference it may be assumed that he entered either by sneaking across the border or by representing to the im-

migration authorities that he was a citizen.

15. See generally Gordon & Rosenfield, supra, § 4.7c, at 4-41 (Supp.1970); 45 Wash.L.Rev. 637 (1970).

"Failure of the Immigration and Naturalization Service to charge the petitioner specifically with deportability for fraud does not render Sec. 241 (f) inapplicable. Errico, supra 385 U. S. at 217, 87 S.Ct. 473. Petitioner argues that having the requisite family ties in the United States and having obtained her immigration visa by fraudulently concealing her previous deportation, Sec. 241(f) saves her from deportation. Her interpretation of Sec. 241(f) ignores the statutory restriction that an alien so saved must be 'otherwise admissible.' She would never have been admissible without permission to reapply after deportation. 8 U.S.C.A. Sec. 1182(a) (17).

"Immigration and Naturalization Service v. Errico, supra, resolved a conflict in the Circuits on an interpretation of Section 241(f). But Errico does not benefit the petitioner. It decides the question 'whether the statute saves from deportation an alien who misrepresents his status for the purpose of evading quota restrictions, if he has the necessary familial relationship to a United States citizen.' Errico, supra at 215, 87 S.Ct. at p. 475. The Court held that an alien who had, in violation of quota restrictions, obtained entry by fraud and was not otherwise inadmissible could receive the benefits of Section 241(f). That is, the Court held that the 'otherwise admissible' restriction does not apply to fraudulent evasions of quota requirements. But we are not here concerned with an attempt to evade quota restrictions. Petitioner is charged with being qualitatively unacceptable and undesirable under the Immigration and Nationality Act.

"Congress has placed a dual system of control on immigration. Errico was concerned with the quantitative restrictions on immigration. Of far more serious nature are the qualitative restrictions on immigration as established in Sec. 212, 8 U.S.C.A. Sec. 1182. This section enumerates classes of aliens excluded from admission from the United States—e. g., insane persons, narcotic addicts, prostitutes. Included in this classification are aliens who have previously been deported from the United States, unless they have secured permission to reapply for admission. Sec. 212(a) (17), 8 U.S. C.A. Sec. 182(a) (17). This is clearly intended to be a qualitative requirement. See, Besterman, Commentary on the Immigration and Nationality Act, 8 U.S.C.A., page 1 et seq.

"The present version of Section 241 (f) was adopted in 1961, 75 Stat. 655 (1961). It is essentially a reenactment of Section 7 of Pub.L. 85–316, 71 Stat. 640, 8 U.S.C.A. Sec. 1251a enacted in 1957. The judicial and administrative decisions and rulings of the statute which preceded Section 241 (f) held that 'otherwise admissible' applied to qualitative standards. Langhammer v. Hamilton, 295 F.2d 642 (1st Cir. 1961); Matter of S———, 9 I. & N.Dec. 496 (1961). A fair interpretation of the legislative history and the terms of the present Section 241(f) requires the conclusion that Congress had no intention of giving a new and different meaning to the phrase 'otherwise admissible.' The legislative history of Section 241(f) is set forth in Immigration and Naturalization Service v. Errico, supra. To adopt the petitioner's interpretation of 'otherwise admissible' would be to delete the phrase from the statute. The phrase would have no purpose if it did not refer to qualitative restrictions, especially since the Errico decision holds that the Section relieves properly situated aliens from the quantitative restrictions of the Act. We are unwilling to attribute to Congress an intent to afford a means of wholesale evasion of the Immigration and Nationality Act to those aliens, no matter how qualitatively undesirable, who are able to conceal by means of fraud their undesirability, merely because they have the requisite family ties in this country. Therefore, we reach the conclusion that petitioner is

not saved from deportation by Section 241(f) since at the time of her entry she was not otherwise admissible."

409 F.2d at 337–338 (footnote omitted).

See also Velasquez Espinosa v. Immigration & Naturalization Serv., 9 Cir. 1968, 404 F.2d 544.

In addition to the charge that petitioner was excludable at time of entry because he did not possess an immigrant visa, the Government charged excludability on the basis of draft evasion. Section 212(a) (22), 8 U.S.C.A. § 1182(a) (22), provides that the following classes of aliens are excludable and subject to deportation under section 241(a) (1):

"Aliens who are ineligible to citizenship, except aliens seeking to enter as nonimmigrants; or persons who have departed from or who have remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency, except aliens who were at the time of such departure nonimmigrant aliens and who seek to reenter the United States as nonimmigrants; "

If sustained, this qualitative ground of excludability would render petitioner not "otherwise admissible" and thus ineligible for relief under section 241(f). See Velasquez Espinosa v. Immigration & Naturalization Serv., supra; Loos v. Immigration & Naturalization Serv., 7 Cir. 1969, 407 F.2d 651, cert. denied, 396 U.S. 877, 90 S.Ct. 150, 24 L.Ed.2d 135; Ramasauskas v. Flagg, 7 Cir. 1962, 309 F.2d 290. The Special Inquiry Officer found the charge supportable, and the Board sustained this finding.[16] We find this conclusion clearly supported by the record.

■■■ There can be little doubt that petitioner remained outside the United States to avoid military service. Although Jolley disputes the fact, the evidence clearly reveals that he failed to respond to induction orders issued after he renounced his citizenship. Indeed, the very basis of his first argument—that he did not voluntarily renounce his citizenship—is that he was compelled to abandon his country because of his abhorrence of the Selective Service laws. We therefore think it clear that petitioner "remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency." [17] Having done so, petitioner is ineligible for the relief provid-

16. Petitioner argues that the Board did not uphold the finding of the Special Inquiry Officer which found deportability under section 212(a) (22). While the Board's opinion is somewhat ambiguous, a careful reading convinces us that deportability was sustained on alternative grounds—failure to possess an immigrant visa and evasion of the draft.

17. Before the Special Inquiry Officer petitioner raised two further objections to the applicability of section 212(a) (22). First Jolley argued that the section was inapplicable because he did not remain outside the country "in time of war or a period declared by the President to be a national emergency." This argument is without merit. On December 16, 1950, President Truman issued Presidential Proclamation Number 2914, 3 C.F.R. 99 (1949–1953 Comp.), declaring that a state of national emergency existed. Neither the Congress nor subsequent Presidents have revoked this proclamation, and we

find no reason to do so. See Nielsen v. Secretary of Treasury, 1970, 137 U.S. App.D.C. 345, 424 F.2d 833, 839; Sardino v. Federal Reserve Bank of New York, 2 Cir. 1966, 361 F.2d 106, cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130; McEwan v. Rusk, E.D.Pa. 1964, 228 F.Supp. 306, 311–313, aff'd per curiam, 3 Cir. 1965, 344 F.2d 963. A state of national emergency as proclaimed by the President, therefore, existed in 1967.

Secondly, petitioner contended that he was not one of the classes of people contemplated by section 212(a) (22). In essence, Jolley argued that the section does not apply to the conduct of citizens who subsequently become aliens. Compare Costello v. Immigration & Naturalization Serv., 1964, 376 U.S. 120, 84 S.Ct. 580, 11 L.Ed.2d 559, with United States ex rel. Eichenlaub v. Shaughnessy, 1950, 338 U.S. 521, 70 S.Ct. 329, 94 L.Ed. 307. See generally Gordon & Rosenfield, supra,

ed by section 241(f) since he is not "otherwise admissible." [18]

## IV.

Petitioner finally attacks the admissibility below of statements he made to an Immigration Service Investigator. Contending that the deportation investigation had begun to focus on him, petitioner argues that he should have been apprised of his right to counsel according to Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Failure to do so, Jolley contends, renders the Investigator's testimony inadmissible and compels us to refuse to enforce the deportation order. We disagree.

 It has been uniformly held that deportation proceedings are civil rather than criminal; thus, the warnings required by *Miranda* are not automatically applicable. *See* Lavoie v. Immigration & Naturalization Serv., 9 Cir. 1969, 418 F.2d 732, cert. denied, 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92; Nason v. Immigration & Naturalization Serv., 2

Cir. 1967, 370 F.2d 865; Pang v. Immigration & Naturalization Serv., 3 Cir. 1966, 368 F.2d 637, cert. denied, 386 U.S. 1037, 87 S.Ct. 1490, 18 L.Ed.2d 601. *See generally* Haney, Deportation and the Right to Counsel, 11 Harv.Int'l L.J. 177 (1970). In any event, the statements attributed to petitioner by the Investigator were merely cumulative of documentary evidence already introduced. Basically, petitioner stated to the Investigator that he had renounced his citizenship in Canada and had entered the United States through Detroit, facts already amply developed. Thus, even if there were error, it was harmless.

We have carefully considered petitioner's other contentions and find them all without merit. The order of deportation is affirmed.

RIVES, Circuit Judge (dissenting):

I am constrained to disagree with the majority's finding "that with regard to nationality 'no genuine issue of material fact is presented'." [1] To my way of

---

at § 4.5d. This argument ignores the fact that the Special Inquiry Officer and the Board based their findings of draft evasion on the conduct of Jolley beginning with and following his renunciation—a period of time when he clearly was an alien. Moreover, the language, purpose, and legislative history of the section lead us to conclude that it does apply to the conduct of citizens who only subsequently lose their citizenship. While the first portion of the section refers to aliens, the middle portion at issue here speaks of "persons" who departed from or who remained outside the United States to evade or avoid service. This literal application to aliens who engaged in the proscribed conduct while citizens is reaffirmed by the section's legislative history. The predecessor of this section was passed by Act of Sept. 27, 1944, 58 Stat. 746. A companion section in that enactment provided that a citizen of the United States who departed from or remained outside the United States to avoid the draft would lose his citizenship. Read together, therefore, the two sections provided that a United States citizen who left the country to evade the draft (1) would lose his United States citizenship and (2) could not be readmitted as an alien. While the first section of this

Act, codified at 8 U.S.C.A. § 1481(a) (10), is clearly unconstitutional, Kennedy v. Mendoza-Martinez, supra; see Afroyim v. Rusk, supra, that does not mean that section 212(a) (22) is inapplicable to a citizen who has voluntarily expatriated himself. In that situation, the clear congressional desire to deny reentry to persons who have avoided the obligations of military service may be given effect. Since we have held that petitioner has voluntarily relinquished his citizenship, he is subject to exclusion under the Act.

18. Nor is petitioner aided by the fact that he subsequently returned to the United States and, following dismissal of criminal charges under the Selective Service laws, managed to secure a I-S classification from his Local Board on the basis of graduate study. In a similar case one court has held that an alien who left the country to avoid the draft but who subsequently returned and enlisted in the armed forces nevertheless was excludable under section 212(a) (22). Ramasauskas v. Flagg, supra. Jolley's case is less sympathetic, for, by his machinations, he has been able to prevent induction altogether.

1. Footnote 5 to majority opinion.

thinking the petitioner claims to be a national of the United States, his claim is not frivolous, and a genuine issue of material fact as to his nationality is presented. Accordingly, this Court should not render "summary judgment," but should transfer the proceedings to the United States District Court for the district where the petitioner has his residence for hearing de novo of the nationality claim pursuant to 8 U.S.C. § 1105a (a)(5):

"(5) whenever any petitioner, who seeks review of an order under this section, claims to be a national of the United States and makes a showing that his claim is not frivolous, the court shall (A) pass upon the issues presented when it appears from the pleadings and affidavits filed by the parties that no genuine issue of material fact is presented; or (B) where a genuine issue of material fact as to the petitioner's nationality is presented, transfer the proceedings to a United States district court for the district where the petitioner has his residence for hearing de novo of the nationality claim and determination as if such proceedings were originally initiated in the district court under the provisions of section 2201 of Title 28. Any such petitioner shall not be entitled to have such issue determined under section 1503(a) of this title or otherwise."

I agree with the dissenting member of the Board of Immigration Appeals that "this record fails to establish by clear, unequivocal and convincing evidence that respondent voluntarily and meaningfully renounced his United States citizenship, acquired by reason of his birth here * * *." The majority treats the issue too narrowly when it inquires simply whether petitioner's formal renunciation was made under duress. That attaches undue importance to the Act of Congress providing for loss of nationality by making a formal renunciation,[2] whereas the vital question is the intention on the part

of the citizen himself. Afroyim v. Rusk, 1967, 387 U.S. 253, 264, 87 S.Ct. 1660, 18 L.Ed.2d 757. As Afroyim teaches, the Government is without power to rob a citizen of his citizenship, he has "a constitutional right to remain a citizen in a free country unless he voluntarily relinquishes that citizenship." (387 U.S. at 268, 87 S.Ct. at 1668.) The issue is much broader than a question of whether the petitioner voluntarily made a renunciation of nationality in the form prescribed by Congress. The issue is whether petitioner truly intended to relinquish his citizenship.

Resolution of that issue depends not only on the formal renunciation, but upon all of the surrounding facts and circumstances. When those are examined, it becomes apparent that petitioner's paramount intention was to avoid being inducted into the armed forces. That much was conceded by the majority of the Board of Immigration Appeals: "Even though the respondent did not testify as to the circumstances which led him to execute the renunciation, we agree that it is clearly inferable that respondent's action was motivated by his desire to avoid induction in our armed forces." Again, I agree with the views so well expressed by the dissenting member of the Board:

"It would seem that in all such cases, including renunciation, the person involved should be given, to the extent possible, an opportunity to state fully all the facts and circumstances, and the motives and purposes surrounding the expatriative act, with emphasis on ascertaining the intent in performing such act. While respondent gave very limited testimony, the other evidence of record appears clear on this important aspect of the case.

"Whatever else may emanate from respondent's conduct in violating the draft laws, criminal proceedings or otherwise, his continued attempts at reclassifications, both before and after he left the United States, his stated

2. 8 U.S.C. § 1481(a)(6).

reasons a. the time of renunciation and his letter to the draft board the following day, all concerned with his prospective status in the military, evince a clear intent that his act was involuntary. While renunciation cannot be used as 'on again, off again' to justify a change of mind, respondent's act was not a normal act of renunciation. He did not acquire a new nationality but became a 'man without a country.' The possibility of deportation is remote if not indeed, improbable."

In *Afroyim*, the Court commented: "In some instances, loss of citizenship can mean that a man is left without the protection of citizenship in any country in the world—as a man without a country." (387 U.S. at 268, 87 S.Ct. at 1668.) This is such an instance. There is no indication that petitioner intended to become a citizen of Canada. Did he truly intend to become a man without a country? His acts of marrying a United States citizen and of re-entering the United States, albeit illegally, are strong indications that he did not truly intend to relinquish his citizenship. There is, I submit, more than a genuine issue of material fact as to the petitioner's nationality.

As both the majority and the dissenting member of the Board of Immigration Appeals recognized, and as is implicit in the majority opinion of this Court, what the petitioner was really trying to do was to evade or avoid being drafted. For that act he was subject to the prosecution which was begun and subsequently dismissed.[3] True, a successful prosecution would be difficult so long as the petitioner could claim that he had voluntarily renounced his citizenship, but that difficulty might be obviated by the hearing de novo of petitioner's claim to be an American citizen provided by 8 U.S.C. § 1105a(a)(5).

It would be unworthy of our Government simply to elect the much harsher penalty of deportation, which will leave

the petitioner "without the protection of citizenship in any country in the world" (387 U.S. 268). Petitioner will be an outcast for the rest of his life, beyond the pardoning power even of the President. Such an election on the part of the Government should not receive the sanction of this Court—certainly not without the thorough hearing de novo of his claim to be an American citizen provided by 8 U.S.C. § 1105a(a)(5). I respectfully dissent.

---

3. See footnote 4 to majority opinion.