**Ernesto ESPINOZA–CASTRO,**
**Petitioner,**

v.

**IMMIGRATION AND**
**NATURALIZATION SERVICE,**
**Respondent.**

No. 99–70588.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 15, 2001

Filed March 22, 2001

**1182**

Gary Finn, Indio, California, for the petitioner.

Jeffrey J. Bernstein and John S. Hogan, United States Department of Justice, Civil Division, Washington, D.C., for the respondent.

Before: BEEZER, T.G. NELSON, and BERZON, Circuit Judges.

T.G. NELSON, Circuit Judge:

Ernesto Espinoza–Castro, a native and citizen of Mexico, petitions for review of the Board of Immigration Appeals' (BIA's) decision affirming the Immigration Judge's (IJ's) finding that Espinoza was deportable pursuant to 8 U.S.C. § 1251(a)(1) because (1) he was excludable at entry under 8 U.S.C. § 1182(a)(22) for having remained outside the United States to avoid or evade military service during a period of national emergency, and (2) he was not covered by a presidential pardon for violations of the Selective Service Act.

At oral argument, counsel conceded that petitioner was not covered by the presidential pardon. Thus, the only question remaining is whether substantial evidence supports the BIA's determination that Espinoza was excludable at entry under 8 U.S.C. § 1182(a)(22). Espinoza argues that he was not excludable because he did not leave the United States primarily to avoid or evade service in the armed forces but rather because he needed to support his family. In addition, he argues that he was not excludable because no national emergency existed when he deserted the Army. Because substantial evidence supports the BIA's decision, we deny Espinoza's petition.

---

1. The underlying facts, which are essentially undisputed, are taken from the IJ's oral decision.

## FACTS & PROCEDURAL HISTORY[1]

### A. *Initial Entry under Immigrant Visa*

The petitioner, Ernesto Espinoza–Castro, is approximately sixty-three years old. He is a native and citizen of Mexico, but his mother is a United States citizen. In August 1960, when Espinoza was twenty-two, his mother obtained an immigrant visa for him. At that time, Espinoza was the principal, if not the sole, supporter of his family, which consisted of his mother and five younger brothers. Before he received his visa in 1960 and came to the United States, Espinoza earned approximately $200 per month working as a professional musician in Mexicali, Mexico.

When Espinoza entered the United States, he was informed by United States Government authorities that he was required to register for selective service within six months of entry. He did so. For a brief time, Espinoza worked as a professional musician in the United States, earning approximately $400 per month. He was able to give his mother approximately half of his earnings for the support of the family. Within a short time, however, Espinoza was drafted. He was inducted into the United States Army on October 26, 1961.

While in the Army, Espinoza was paid approximately $85 per month. Because his basic expenses were paid by the Army, Espinoza was able to send 90% to 95% of this amount (or approximately $75 per month) to his family.

Espinoza underwent basic training at Fort Ord, California, for about two months. He was given leave around Christmas to visit his family. Espinoza never returned from that leave. Instead, on the day he was to report for duty, he went to Mexico City, where he remained for several years.

While in Mexico City, Espinoza enrolled in music school, which he attended for at

least three years. While in school, he worked part-time as a musician, earning approximately $150 per month. After paying expenses, he was able to send approximately $75 per month to his family, roughly the same amount he sent while in the Army.

As of January 12, 1962, the Army deemed Espinoza a peacetime deserter. United States Government authorities contacted Espinoza twice while he lived in Mexico City. The FBI contacted him in 1964. Espinoza stated that he intended never to return either to the United States or to military service. The INS contacted him in 1969. They informed Espinoza that he had to surrender his I–551 (his resident alien card) and that he could not return to the United States because of his desertion.

Espinoza was given an undesirable discharge from the Army on September 23, 1965. The reason listed for the discharge is "[d]esertion." His discharge papers note that the desertion was a peacetime desertion and state that a trial was "deemed inadvisable."

## B. *Re–Entry under Immigrant Visa*

Sometime prior to 1988, Espinoza went to the United States Consulate to inquire about the possibility of re-immigrating. When Espinoza stated that he had previously deserted from the United States Army, consular officials told him that he would never be able to return to the United States.

In 1998, Espinoza's brother indicated that an attorney to whom he had spoken thought Espinoza might still be able to re-immigrate to the United States despite his desertion. Espinoza again began the process of applying for an immigrant visa. He applied, just as he had before, as the unmarried son of a United States citizen— his mother. After consulting an attorney, Espinoza answered "no" to the question of whether he had ever departed from or remained outside the United States to avoid or evade military service. In August 1998, Espinoza was granted an immigrant visa.

When Espinoza presented himself at the United States Port of Entry, the INS discovered that he was in fact a deserter who had previously been a lawful permanent resident of the United States. Espinoza was charged with and convicted of willfully making false and misleading representations upon entry into the United States, a misdemeanor. He was sentenced to six months in jail.

## C. *Deportation Proceeding and IJ and BIA Decisions*

After Espinoza served his six-month sentence, the INS initiated deportation proceedings. Espinoza was charged with being deportable under 8 U.S.C. § 1251(a)(1) (1990) because he was excludable at entry under 8 U.S.C. § 1182(a)(22). At the time of Espinoza's entry, § 1182(a)(22) provided for the exclusion of aliens who deserted the United States armed forces to avoid service or training during a period of war or national emergency.[2]

After several hearings, the IJ held that Espinoza had left and remained outside the country to avoid or evade military service or training. Thus, the IJ concluded he was excludable at entry pursuant to 8 U.S.C. § 1182(a)(22).[3] In so holding, the IJ considered and accepted Espinoza's testimony that he was the primary supporter of his family. In addition, the IJ consid-

**2.** Espinoza was also charged with being excludable at entry for committing fraud or willful misrepresentation of a material fact and not having a valid immigrant visa. However, the order of deportation that was eventually issued was based only on Espinoza being excludable at entry as an alien who had deserted the United States armed forces to avoid service or training.

**3.** The IJ also found Espinoza excludable under 8 U.S.C. § 1182(a)(20) (1990) for not having a valid entry document. However, because resolution of the § 1182(a)(22) issue controls in this case whether or not Espinoza is also excludable under § 1182(a)(20) for not having a valid entry document, we do not separately analyze § 1182(a)(20).

ered and accepted the fact that Espinoza had been able to contribute approximately $200 per month towards the support of his family just prior to being drafted. The IJ nonetheless rejected Espinoza's contention that he left the military out of economic necessity—the need to provide for his family. Although Espinoza earned less when he served in the military than he had previously, the IJ noted that he could devote a much larger percentage of those earnings to the support of his family. The military provided his room, board, and other basic necessities. Moreover, the IJ noted that Espinoza did not return to his employment in Mexicali, from which he had been earning approximately $200 per month. Instead, Espinoza went to music school for several years and worked only part-time. He was able to contribute, at most, $75 per month to his family's support during that period, approximately the same amount he could have contributed had he remained in the military. The IJ stated:

> [I]n reality, between the choices that he made, not between the possibilities that existed but between the choices that he made, there was no legitimate economic disadvantage; that is, he would not have been any more disadvantaged by having remained in the military than by having chosen on the date, instead of reporting for duty, to go to music school in Mexico City that he chose. My evaluation of all of the circumstances is indeed that the military pay and the military service would probably have provided a more certain level of support than that which he faced in a somewhat uncertain or uneven work in conjunction with his school in Mexico City, but, at best, they are nearly even. So, his later statements in 1989 that he left because of economic hardship may be in reflection of those 30 years ago of the money he was making in Brawley, the money that he made in Mexicali. Maybe he thought in looking at it nearly 30 years after the fact that yes, well, that's why I left; but from the point of view of 1961 and 1962, that wasn't true.

Thus, the IJ concluded that remaining in the military would have posed no immediate economic disadvantage to Espinoza. Quite the contrary, the IJ reasoned that the military salary was probably more secure than the earnings received from working as a musician. For these reasons, the IJ rejected Espinoza's contention that he had left out of economic necessity and concluded that Espinoza left and remained outside the United States to avoid or evade service or training in the armed forces.

The IJ also rejected Espinoza's claims that his desertion from the Army did not occur during a time of war or national emergency, and that his desertion was pardoned by President Carter's Presidential Proclamation No. 4483 issued on January 21, 1977. The IJ therefore ordered Espinoza deported.

The BIA dismissed Espinoza's appeal for the reasons set forth in the IJ's decision. The BIA specifically found, after its own review of the record, that Espinoza's argument that he deserted the Army to better support his family economically was "not plausible," and that Espinoza was not covered by Presidential Proclamation No. 4483. Because Espinoza has abandoned his appeal of the second point, regarding the Presidential Proclamation, we only review the first.

## JURISDICTION

Deportation proceedings were initiated against petitioner prior to April 1, 1997. Therefore, the jurisdiction of this court arises under 8 U.S.C. § 1105a(a), as modified by the transitional rules for judicial review set forth in § 309(c)(4) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).[4]

---

4. Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996); *see Kalaw v. INS,* 133 F.3d 1147, 1150 (9th Cir.1997).

## STANDARD OF REVIEW

 We review the factual findings underlying the BIA's decision for substantial evidence.[5] We must deny the petition for review unless the evidence not only supports a contrary result, but compels it.[6]

## ANALYSIS

*Substantial evidence supports the BIA's determination that Espinoza was deportable because he remained outside the United States to avoid or evade training or service in the United States military during a period of war or national emergency.*

The IJ found Espinoza excludable under 8 U.S.C. § 1182(a)(22). At the time of Espinoza's deportation hearing, this provision excluded from admission to the United States aliens "who have departed from or who have remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency."[7]

Espinoza claims that the finding of excludability under § 1182(a)(22) was unsupported by substantial evidence because (1) he did not depart and remain outside the United States to avoid or evade military service and (2) the period of time in question was neither a time of war nor a period declared by the President to be a national emergency. We disagree on both points.

### A. *Purpose of Departure*

 Espinoza first argues that he left the United States primarily to support his family and not to avoid service in the United States military. Thus, he claims he does not fall under the provisions of

5. *Salaam v. INS*, 229 F.3d 1234, 1237–38 (9th Cir.2000).

6. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Lim v. INS*, 224 F.3d 929, 933 (9th Cir.2000); *Singh–Kaur v. INS*, 183 F.3d 1147, 1149–50 (9th Cir.1999).

7. 8 U.S.C. § 1182(a)(22) (1991).

§ 1182(a)(22). In support of his argument, he relies on *Matter of Nunez–Toro.*[8]

In *Nunez–Toro*, the BIA held that § 1182(a)(22) did not exclude the alien in question because his primary purpose in leaving the United States had not been to avoid military service but to help his mother.[9] In so holding, the BIA relied on facts showing that the alien had voluntarily enlisted in the United States Army, that he genuinely believed his mother needed aid, that he had voluntarily surrendered to the United States military authorities in Costa Rica in 1963, and that he had, for some time, expressed a desire to be permitted to complete his enlistment of three years in the United States Army.[10]

The facts in this case are in stark contrast to those in *Nunez–Toro*. First, Espinoza showed no desire to complete his term of military service after his desertion. When contacted by United States officials in 1964, for example, he told them he had no intention of returning either to military service or to the United States. Thus, unlike Nunez–Toro, Espinoza has never sought to fulfill his military duties. Second, even if in some circumstances economic reasons might remove an alien from the reach of § 1182 as familial need did in *Nunez–Toro*, this case would not present those circumstances.[11] The facts belie Espinoza's claim that he left for economic reasons. As the IJ pointed out, after Espinoza deserted, he chose to engage in an enterprise that allowed him to send no more money back to his family than had his military service.

The IJ specifically rejected Espinoza's contention that he left for economic reasons and found instead that Espinoza left

8. 11 I & N Dec. 501, 1966 WL 14285 (BIA 1966).

9. *Id.* at 504.

10. *Id.*

11. We need not decide whether economic circumstances might remove an alien from the reach of the statute. Accordingly, we decline to do so.

**1186**

and remained outside the United States to avoid or evade service or training in the military. The BIA agreed, specifically noting that Espinoza's contention that he left the military for economic reasons was "not plausible." The evidence supporting the BIA's decision is substantial and does not compel a contrary result. Thus, we deny the petition for review on this issue.[12]

### B. National Emergency

█ An alien who has left or remained outside the United States to evade military service or training will be excluded under § 1182(a)(22) only if the alien left or remained outside the United States during a "time of war or a period declared by the President to be a national emergency."[13] Espinoza argues that insufficient evidence supported the IJ's finding that he departed from or remained outside the United States during a time of war or national emergency. We disagree.

On December 16, 1950, President Truman issued Presidential Proclamation No. 2914.[14] That proclamation, which was in effect until September 14, 1978,[15] declared that a state of national emergency existed.[16] Thus, at the time that Espinoza departed the United States and during the time he remained outside the United States prior to his dishonorable discharge in 1965, a state of national emergency existed in the United States.

For the foregoing reasons, the petition for review is **DENIED.**

---

**12.** See *Elias–Zacarias,* 502 U.S. at 483–84, 112 S.Ct. 812; *Lim,* 224 F.3d at 933; *Singh–Kaur,* 183 F.3d at 1149.

**13.** U.S.C. § 1182(a)(22) (1991).

**14.** Presidential Proclamation No. 2914, 3 C.F.R. 99 (1953).

**15.** See 50 U.S.C. § 1601 ("All powers and authorities possessed by the President, any other officer or employee of the Federal Government, or any executive agency ... as a

---

result of the existence of any declaration of national emergency in effect on September 14, 1976 are terminated two years from September 14, 1976."); *Jolley v. INS,* 441 F.2d 1245, 1255 n. 17 (5th Cir.1971) (noting that Presidential Proclamation No. 2914 declared a state of national emergency and that this state of national emergency still existed in 1967).

**16.** See Presidential Proclamation No. 2914, 3 C.F.R. 99 (1953); *Jolley,* 441 F.2d at 1254 n. 17.