March 24, 1977

## 77–14  MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### Effect of Presidential Pardon on Aliens Who Left the Country to Avoid Military Service

You have asked us to examine the question of whether the President's Proclamation and accompanying Executive order granting a pardon to all those who violated the Military Selective Service Act between August 4, 1964, and March 28, 1973, will have the effect of removing the exclusion of aliens who departed from or remained outside the United States to avoid or evade training or service in the Armed Forces. We agree with the Immigration and Naturalization Service (INS) that the pardon should be given that effect. We also agree with INS that whether an alien seeking readmittance should be regarded as a permanent resident alien returning from a temporary visit abroad, is a question of fact that should be decided on a case-by-case basis. But we believe that the terms of the statute and the case law construing it permit more flexibility in making this determination than the INS appears to suggest. Finally, we do not believe that an expatriated citizen may properly be regarded as an alien lawfully admitted for permanent residence.[1]

### I.  Applicability of the Pardon to 8 U.S.C. § 1182(a)(22)

An alien is excluded from entry into the United States if he or she is within any of the classes enumerated in 8 U.S.C. § 1182(a).[2] Among the aliens excluded under this provision are:

> Aliens who are ineligible to citizenship, except aliens seeking to enter as nonimmigrants; or persons who have departed from or who have remained outside the United States to avoid or evade training or service in the armed forces in time or war or a period declared by the President to be a national emergency, except aliens

---

[1] The Attorney General subsequently approved these conclusions.

[2] The Immigration and Nationality Act, 66 Stat. 166 (1952) codified at Title 8, United States Code.

who were at the time of such departure nonimmigrant aliens and who seek to reenter the United States as nonimmigrants. 8 U.S.C. § 1182(a)(22).

Proclamation 4483, issued by the President on January 21, 1977, grants a pardon to everyone "who may have committed any offense between August 4, 1964 and March 28, 1973 in violation of the Military Selective Service Act." 13 Weekly Comp. Pres. Doc. 90. The Proclamation does not on its face purport to pardon the "offense" of departing from or remaining outside the United States to avoid or evade military training or service in the Armed Forces and thereby to remove the sanction of exclusion from the United States.

Executive Order 11967, also issued by the President on January 21, 1977, implements the pardon by, *inter alia,* instructing the Attorney General to seek dismissal of indictments for offenses covered by the pardon. *Id.* Section 3 of the order provides:

> Any person who is or may be precluded from reentering the United States under 8 U.S.C. 1182(a)(22) or under other law, by reason of having committed or apparently committed any violation of the Military Selective Service Act shall be permitted as any other alien to reenter the United States.

The Executive order and the Proclamation together evince a clear intent to remove the exclusion imposed by 8 U.S.C. § 1182(a)(22). Because the Proclamation itself only mentions violations of the Military Selective Service Act, and the Executive order by its terms seems to lift the exclusion only where it would otherwise apply "by reason of" an underlying violation of that Act, it would appear that the intent was to lift the exclusion only derivatively by removing a consequence of having violated the Military Selective Service Act. However, as explained below, 8 U.S.C. § 1182(a)(22) was probably not intended to apply to any conduct that is not also unlawful under the Selective Service Act. The pardon therefore will have the same effect whether it operates derivatively or directly—*i.e.,* by pardoning the separate "offense" created by 8 U.S.C. § 1182(a)(22). *See* footnote 8, *infra.*

The present § 1182(a)(22) was first enacted in 1944 in an Act that had only one other section: the predecessor to the recently repealed 8 U.S.C. § 1481(a)(10),[3] which provided that any person who was a national of the United States would lose his nationality by departing from or remaining outside the jurisdiction of the United States in time of war or during a national emergency for the purpose of avoiding or evading training and service in the military forces of the United States. 58 Stat. 746. It is evident that the two sections of the 1944 Act merely applied different sanctions for the same underlying conduct of leaving

---

[3] 8 U.S.C. § 1481(a)(10) was repealed by Pub. L. No. 94–412, 90 Stat. 1258 (1976).

or remaining outside the country to avoid military training or service.[4] Indeed, by virtue of the interaction between the two provisions, a U.S. national who left the country to avoid or evade training or service was expatriated and, as an alien, would then be excluded from entry into the United States. *See, Jolley* v. *INS,* 441 F. 2d 1245, 1255 n. 17 (5th Cir. 1971).

The Attorney General described the purpose of the expatriation section of the bill in his letter to Senator Russell:

> The files of this Department disclose that at the present time there are many citizens of the United States who have left this country for the purpose of escaping service in the armed forces. While such persons are liable to prosecution for violation of the Selective Service and Training Act of 1940, if and when they return to this country, it would seem proper that in addition they should lose their United States citizenship. Persons who are unwilling to perform their duty to their country and abandon it during its time of need are much less worthy of citizenship than are persons who become expatriated on any of the existing grounds. S. Rep. No. 1075, *supra.*

The Attorney General's statement that persons subject to expatriation under the bill would be "liable to prosecution for violation of the Selective Service and Training Act of 1940" if and when they returned, indicates that the expatriation provision was to apply where the underlying conduct also violated that Act. His description of the sanction of expatriation as being "in addition" to criminal penalties for the conduct further supports this view.[5]

The view that the expatriation section of the 1944 Act applied only to conduct that gave rise to liability under the Selective Service and Training Act also is reflected in the Supreme Court's opinion in *Kennedy* v. *Mendoza-Martinez,* 372 U.S. 144 (1963), which held that the expatriation provision was penal rather than regulatory in nature and was therefore unconstitutional because it automatically deprived a citizen of his nationality without the procedural protections required in a criminal trial. One of the factors the Court cited as ordinarily being useful in determining whether a sanction is penal or regulatory—and

---

[4] In a letter dated February 16, 1944, to Senator Russell, Chairman of the Senate Committee on Immigration, the Attorney General stated:

> I invite your attention to the desirability of enacting legislation which would provide (1) for the expatriation of citizens of the United States who in time of war or during a national emergency leave the United States or remain outside thereof for the purpose of evading service in the armed forces of the United States, and (2) for *the exclusion from the United States of aliens who leave this country for the above-mentioned purpose.* S. Rep. No. 1075, 78th Cong., 2d Sess., 2 (1944). [Emphasis added].

[5] The Attorney General's description also indicates that the bill was intended to close a gap in the coverage of existing criminal provisions by imposing a sanction upon those who had removed themselves beyond the criminal jurisdiction of the United States. *See* 90 Cong. Rec. 7628–29 (1944).

36

one that suggested that the expatriation provision was penal in nature—was "whether the behavior to which it applies is already a crime." *Id.* at 168.[6] Justice Brennan explicitly stated in his concurring opinion that it was obvious that the expatriation provision "does not reach any conduct not otherwise made criminal by the selective service laws." *Id.* at 191 n. 5. Because the expatriation section and the section that was the predecessor of the present 8 U.S.C. § 1182(a)(22) applied to the same underlying conduct, it follows that the latter provision similarly should be regarded as intended to apply only to conduct that also gives rise to criminal liability under the Military Selective Service Act.[7] In our opinion, the President's Proclamation of pardon of offenses arising under the Military Selective Service Act may properly be given the effect intended in Section 3 of Executive Order 11967 of lifting the exclusion from the United States which may result from the same conduct.

The leading case regarding the effect of a Presidential pardon is *Ex parte Garland,* 71 U.S. 333 (1866). In 1865, Congress enacted a statute providing that no person could be permitted to practice in Federal court unless he took an oath asserting that he had never voluntarily borne arms against the United States or given aid or comfort to enemies of the United States. In holding that a Presidential pardon granted to a Confederate sympathizer for all offenses committed during the Rebellion had the effect of removing the bar imposed by the statute, the Court stated:

> A pardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that

---

[6] The Court did note that the elements of the "crime" created by the expatriation provision and that created by the Selective Training and Service Act were not identical, 372 U.S. at 167 n. 21, but this observation appears to have been based on the conclusion that the Immigration and Nationality Act contained an *additional* element not found in the other Act—*i.e.,* departing from or remaining outside the country for the purposes declared to be unlawful. The Court did not suggest that expatriation would occur even if the underlying conduct did not constitute a violation of the Selective Training and Service Act.

Also, the expatriation section, as reenacted in the Immigration and Nationality Act, provided that failure to comply with any provision of the compulsory service laws of the United States raised the presumption that a citizen departed or remained outside the country for the purpose of evading or avoiding service. 8 U.S.C. § 1481(a)(10). This underscores the nexus to criminal conduct.

[7] Section 11 of the Selective Training and Service Act of 1940, 54 Stat. 894, which contained the criminal provisions of that Act, is in all material respects identical to the principal provision defining offenses and penalties under current law. See 50 U.S.C. App. § 462(a). Thus, the present connection between the exclusion provision and the Selective Service Act appears to be as direct as it was in 1944.

in the eye of the law the offender is as innocent as if he had never committed the offense. *Id.* at 380.[8]

*See also, Knote* v. *United States,* 95 U.S. 149, 153 (1877). The language in *Ex parte Garland* is now generally believed to be too sweeping. E. Corwin, The President: Office and Powers, 1787–1957 (1957), at 166–67; W. H. Humbert, The Pardoning Power of the President (1941), at 76–78. For example, the Court held in *Carlesi* v. *New York,* 233 U.S. 51 (1914), that a Presidential pardon of a Federal offense did not prevent a State court from considering that offense for purposes of sentencing the defendant under a second offender statute. The Court was careful to note, however, that the New York statute did not purport to authorize additional punishment for the pardoned offense, but only prescribed penalties for the later offense taking into account the character of the offender, including his past conduct. *Id.* at 57. In fact, *Ex parte Garland* may itself be viewed as a case in which the disability actually was imposed as a penalty rather than as a regulation of the practice of law. Humbert, *supra,* at 78 n. 95.[9] The President's constitutional authority to pardon offenses carries with it the power to release all penalties and forfeitures that accrue from the offenses. *Osborn* v. *United States,* 91 U.S. 474 (1875); 36 Op. A. G. 193 (1930). Thus, whether a pardon removes a particular disability depends on whether the statutory provision is thought to impose a penalty for an offense or merely to prescribe a qualification for a Government benefit. 31 Op. A. G. 225, 226–27 (1918). *See also* 39 Op. A. G. 132, 134–35 (1938); 36 Op. A. G. 193 (1930); 22 Op. A. G. 36 (1898).

Many of the grounds for exclusion provided by 8 U.S.C. § 1182(a) could properly be regarded as establishing qualifications for entry, rather than punishment for past acts, and as such they would presumably be unaffected by a Presidential pardon. This, however, cannot be said of the ground for exclusion in 8 U.S.C. § 1182(a)(22). The companion provision for expatriation of a citizen who departed or remained outside the country to avoid or evade military training or service was specifically found to be penal rather than regulatory in character, in *Kennedy* v. *Mendoza-Martinez, supra,* after an exhaustive consideration of the language and legislative history of the 1944 Act and its predecessors. The evidence of a punitive intent in the legislative history and antecedents of the 1944 Act apply equally to the corollary provision for the exclusion of aliens now contained in 8 U.S.C. § 1182(a)(22). Similarly, the various factors the Court identified as suggesting that the sanc-

---

[8] The four dissenters contended that the Act was merely intended to establish qualifications for the practice of law before Federal courts. In their view, the pardon could relieve the beneficiary from the penalty the law inflicted for his offense, but not from meeting appropriate tests of fitness to engage in the practice of a profession. 71 U.S. at 396–97.

[9] This interpretation of *Ex parte Garland* is supported by the Court's alternative holding that the professional disqualification was intended by Congress as punishment for past acts and therefore was unconstitutional as *ex post facto* legislation. 71 U.S. at 376–380.

tion of expatriation was punitive on its face also apply to the sanction of exclusion of aliens who engage in the very same conduct. 372 U.S. at 168–69. Exclusion from the United States certainly involves an affirmative restraint, and it is analogous to the devices of banishment and exile that "have throughout history been used as punishment." *Id.* at 168 n. 23. From the nature of the provision it seems evident that exclusion may be imposed only upon a finding of scienter, *see, e.g., Riva* v. *Mitchell,* 460 F. 2d 1121 (3d Cir. 1972); *Jolley* v. *INS,* 441 F. 2d 1245 (5th Cir. 1971), and its operation promotes the traditional aims of punishment—retribution and deterrence. The other factors mentioned by the Court are also satisfied here.

Because it appears that Congress has imposed the sanction of exclusion as additional or alternative punishment for conduct that also violates the Military Selective Service Act, rather than as a regulatory measure to establish the qualifications of aliens who enter the United States, we agree with the conclusion of the INS that the President has the constitutional power to lift that exclusion as a consequence of his grant of a pardon for violations of the Military Selective Service Act.[10]

II. Authority for Regarding an Expatriated Citizen as a Lawful Permanent Resident.

INS suggests that a United States citizen who voluntarily relinquished his citizenship can be regarded as an alien lawfully admitted for permanent residence. On its face, this seems to be a strained result, at least as it applies to a native-born citizen. The term "lawfully admitted for permanent residence" is defined under the Immigration and Nationality Act to mean "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20). A native-born citizen would never have been accorded the privilege of residing permanently in the United States "as an immigrant," so it is difficult to see how he could be thought to revert to the status of permanent resident alien by renouncing his citizenship. A naturalized citizen presumably has been accorded the privilege of residing permanently in the United States as an immi-

[10] In our view, the clear punitive purpose of 8 U.S.C. § 1182(a)(22) might well support a conclusion that the section itself defines an offense that may be pardoned by the President, without reference to parallel provisions in the Military Selective Service Act. In *Kennedy* v. *Mendoza-Martinez,* the Court stated that "Congress has plainly employed the sanction of deprivation of nationality as a punishment—*for the offense of leaving or remaining outside the country to evade military service*—without affording the procedural safeguards guaranteed by the Fifth and Sixth Amendments." 372 U.S. 165–66 [emphasis added]. Long before the Supreme Court's decision in *Kennedy* v. *Mendoza-Martinez,* Acting Attorney General John W. Davis advised the Secretary of the Navy that an earlier version of the expatriation statute created an offense and that the disabilities imposed were therefore lifted by an unconditional pardon. 31 Op. A. G. 225, 231–32 (1918). The underlying "offense" of departing from or remaining outside the United States to avoid military service under 8 U.S.C. § 1182(a)(22) is the same, and it could therefore be argued that the penalty of exclusion can be lifted by a pardon intended to have this result. But in view of the conclusion reached in the text, we need not decide here whether 8 U.S.C. § 1182(a)(22) itself states a pardonable offense.

39

grant at some point prior to his naturalization. But, by the terms of 8 U.S.C. § 1101(a)(20), an alien permitted to reside permanently in the United States may possess that immigrant status only as long as the status does not change. When a permanent resident alien becomes a naturalized citizen, he loses his status as an alien altogether. Thus, the language of 8 U.S.C. § 1101(a)(20) does not appear to contemplate that the initial permanent resident status can be resurrected once it has been lost.

As the INS memorandum points out, the Board of Immigration Appeals held in *Matter of Vielma-Ortiz,* 11 I&N Dec. 414 (1965), that a naturalized citizen who had been admitted for permanent residence prior to naturalization reverted to the status of permanent resident alien when he automatically lost his citizenship by voting in a foreign election.[11] The Board specifically noted that the expatriating act of voting in a Mexican election "had nothing to do with the continuance of the status as a lawful permanent resident of the United States," *Id.* at 416, presumably meaning that the individual's act of voting in the particular case did not manifest an intention to abandon his actual residence in the United States.[12]

It is evident that the Board interpreted the phrase "such status not having changed" in 8 U.S.C. § 1101(a)(20) to mean only that the alien must not have abandoned his actual residency in the United States. We do not believe that this construction is appropriate in light of subsequent developments. In *Gooch* v. *Clark,* 433 F. 2d 74, 79 (9th Cir. 1970), the court held that "the definition [in 8 U.S.C. § 1101(a)(20)] *refers not to the actuality of one's residence but to one's status* under the immigration laws" [emphasis in original]. The status involved is that of an *alien* lawfully admitted for permanent residence. A person ceases to be an alien altogether when he becomes a naturalized citizen, and his status as an alien therefore does not remain unchanged as required by 8 U.S.C. § 1101(a)(20).[13]

It also should be noted that the Board's decision in *Matter of Vielma-Ortiz* preceded the Supreme Court's decision in *Afroyim* v. *Rusk,* 387 U.S. 253 (1967), which held that citizenship may be forfeited only

---

[11] A brief passage in Justice Brennan's concurring opinion in *Kennedy* v. *Mendoza-Martinez* lends some support to the result in *Vielma-Ortiz.* He observed that the Government could argue that a citizen who fled the country to avoid military service, "although expatriated, is a resident alien subject to compulsory military service." 372 U.S. at 195 n. 7.

[12] The evidence established that the appellant obtained a voter registration card and voted in a Mexican election primarily to further his business dealings there and that he intended to return to his family in the United States on each occasion that he went to Mexico.

[13] The Supreme Court later stated in *Saxbe* v. *Bustos,* 419 U.S. 65, 72 (1975), that it "read the Act as did the Ninth Circuit in the *Gooch* case to mean that the change in status which Congress had in mind was a change from an immigrant lawfully admitted for permanent residence to the status of a *nonimmigrant* pursuant to 8 U.S.C. § 1257" [emphasis in original]. This passage only speaks of two different statutes that an alien may occupy. It does not suggest that a person might come within 8 U.S.C. § 1101(a)(20) if he was not even an alien for a period of time.

though a voluntary act of relinquishment. The decision in *Vielma-Ortiz* may have stemmed from a desire to soften the harsh impact of automatic expatriation for voting in a foreign election. The decision in *Afroyim* v. *Rusk* removes this pressure for a liberal construction of the statute; the requirement that a person who has renounced his citizenship must assume the position of an alien and apply anew for an immigrant visa or permanent resident status is now but a necessary consequence of a voluntary act. Also, as a practical matter, it would probably be rare that a person who voluntarily renounced his citizenship,[14] with all the severing of ties that implies, would nevertheless be thought to have retained a permanent residence in the United States to which he might now be returning from a "temporary" visit abroad. *See* Part III, *infra.* Therefore, little would probably be gained by regarding an expatriated citizen as an alien lawfully admitted for permanent resident.

For the foregoing reasons, it is our opinion that the result in *Vielma-Ortiz* should not be followed with respect to persons covered by the pardon who have renounced their citizenship.[15]

### III. Standard for Determining Whether an Alien is Returning from a Temporary Visit Abroad.

We agree with the position of INS that the determination whether an alien seeking to enter the United States is "an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit aboard" under 8 U.S.C. § 1101(a)(27)(A) should in general be determined on a case-by-case basis. Judicial and administrative decisions arising under this section have generally looked to the facts of the

---

[14] The INS memorandum, at pp. 10–11, notes that those who have been effectively expatriated either applied for and obtained naturalization in a foreign country or formally renounced their citizenship. 8 U.S.C. §§ 1481(a) (1) and (6). A formal renunciation will usually be unambiguous in regard to subjective intent to relinquish citizenship. *See, e.g., Jolley* v. *INS,* 441 F. 2d 1245 (5th Cir. 1971). But it appears that even an application for and obtaining of naturalization in a foreign country or taking an oath of allegiance to a foreign country will not be regarded as an effective act of expatriation unless it is accompanied by an intent to abandon United States citizenship. *United States* v. *Matheson,* 532 F. 2d 808 (2d Cir. 1976); *King* v. *Rogers,* 463 F. 2d 1188 (9th Cir. 1972).

[15] Section 3 of Executive Order 11967 provides that any person precluded from reentering the United States under 8 U.S.C. § 1182(a)(22) shall be permitted "as any other alien" to reenter the United States. An expatriate who left the country to avoid military service or training is barred from reentry under this section. However, because such an individual could not be regarded as a returning resident alien, the provision for him to reenter "as any other alien" should be construed to mean that he must reenter in the same manner as an alien who no longer has the status of an alien lawfully admitted for permanent residence. He must therefore satisfy all entry requirements, including applicable quota limitations.

41

particular case to determine whether a given absence was temporary.[16] It would be a departure from the usual approach in this area to follow Option A contained in the draft statement prepared by INS for the Attorney General. Under Option A, any alien covered by the pardon who had been lawfully admitted for permanent residence would automatically be regarded to be returning from a temporary visit abroad and therefore eligible for a waiver of documentation requirements under 8 U.S.C. § 1181(b).

Option B proposed by INS would require a case-by-case determination for each alien, and it further states that it "is likely that most aliens in this category will be precluded by the length and circumstances of their absence from qualifying as returning permanent residents." This is apparently based on INS' conclusion (at p. 12 of Commissioner Chapman's memorandum) that the rule established by the cases is that lengthy absence without an explanation amounting to a legal excuse results in loss of returning resident status. We believe INS takes too narrow a view of the concept of a "temporary visit abroad," especially in placing determinative emphasis on the duration of the visit and apparently attaching little significance to the intent of the alien.[17]

The cases considering the question of what constitutes a temporary visit abroad are not entirely consistent; the most important factor that emerges from the cases, however, is whether the alien had a continuing intent to return to the United States—*animus revertendi. See, Matter of Kane,* I&N, Interim Dec. #2371 (April 1, 1975), at 6-8.[18] As stated in the most frequently cited case in this area, "the intention of the departing immigrant must be to return within a period relatively short, fixed

---

[16] 8 U.S.C. § 1181(b) provides that the Attorney General may waive the documentary requirement for returning resident immigrants "in such cases or in such classes of cases and under such conditions as may be by regulations prescribed." The reference to "classes of cases" might suggest that a case-by-case determination is not absolutely necessary. But the statute refers to classes of "returning resident immigrants"; in order to be included in such a class in the first place, an alien must be returning from a temporary visit abroad. *See* 8 U.S.C. § 1101(a)(27)(A). An individualized determination would seem to be required on this point.

[17] At one time, regulations implementing the waiver of the documentary requirement in 8 U.S.C. § 1181(b) provided that a waiver would be considered only if the temporary visit abroad was for 1 year or less. *See, Tejeda* v. *INS,* 346 F. 2d 389, 391 (9th Cir. 1965). The regulation was amended on May 7, 1969, 29 Fed. Reg. 6002, and it no longer contains the 1-year limitation. *See* 8 CFR 242.7a. Waiver is now permitted for temporary visits of longer duration.

[18] In this regard, it may be useful to consider a temporary visit abroad as being in contradistinction to a permanent visit. *Cf.* 8 U.S.C. § 1101(a)(31). Viewed in this light, reference to a temporary visit may be only a label for the more probing question of whether the alien has retained his essential ties to the United States or abandoned them. Many permanent resident aliens who left the country to avoid military service no doubt retained closer personal ties to the United States than to the country to which they fled.

by some early event." *United States ex rel. Lesto* v. *Day*, 21 F. 2d 307, 308–09 (2d Cir. 1927).[19]

Other cases are to the same effect.[20] For example, in *Santos* v. *INS*, 421 F. 2d 1303 (9th Cir. 1970), the court held that a permanent resident alien who left Guam after 12 years to seek other employment was not returning from a temporary visit abroad when he sought entry in San Francisco some 5 years later. The court noted the Special Inquiry Officer's finding that the alien had left with no definite intention either of staying away permanently or of returning, but rather with a purpose to let future events run their course. Thus, there was no evidence of *animus revertendi.* Similarly, in *United States ex rel. Alther* v. *McCandless,* 46 F. 2d 288, 290–91 (3d Cir. 1931), the court held that the mere absence of an intent to remain abroad permanently was not sufficient if there was no evidence of an affirmative intent to return to the United States. It is important to note, however, that the court considered the alien's intent in determining whether his visit abroad was temporary even though he had been out of the country for more than 8 years. *See also, Gamero* v. *INS*, 367 F. 2d 123 (9th Cir. 1966) (alien away 17 years held to have abandoned any intent he may once have had to return to the United States); *United States ex rel. Polymeris* v. *Trudell,* 49 F. 2d 730, 732 (2d Cir. 1931) (absence of 7 years); *Barrese* v. *Ryan,* 203 F. Supp. 880, 888–89 (D. Conn. 1962) (intent of alien controls where it can be ascertained); *Matter of Montero,* 14 I&N Dec. 399, 400 (1973). These cases at least establish that the extent of the visit is not controlling where the intent of the alien may reasonably be questioned. *United States ex rel. Polymeris* v. *Trudell, supra,* 49 F. 2d at 732; *Matter of Kane, supra,* at 6–7.

It is true that courts have cited factors in addition to the intent of the alien in determining whether a given visit was temporary. Others considered have included the duration of the visit and whether the alien has a residence, family ties, property holdings, employment, or business in the United States. *See, e.g., Alvarez* v. *District Director, INS,* 539 F. 2d 1220, 1224–25 (9th Cir. 1976); *Santos* v. *INS, supra; United States ex rel. Lesto* v. *Day, supra; United States ex rel. Alther* v. *McCandless, supra; Matter of Castro,* 14 I&N Dec. 412, 494 (1973). But it is not apparent

---

[19] The court also held that mere retention of domicile is insufficient, standing alone, to make a visit temporary. 21 F. 2d at 308. This conclusion seems sound, because a person retains his prior domicile until he affirmatively establishes a new one, even if he has no intention of returning to the place of domicile. Restatement (Second) of Conflict of Laws § 19.

[20] We also find no requirement articulated in the cases that when an alien's absence is protracted he must have an explanation amounting to a "legal excuse." Rather, when a stay is protracted, the courts appear to look for an explanation that would permit a conclusion that the alien had the intent to return and that his visit was therefore "temporary" despite its duration. The State Department regulation providing that a protracted visit is not temporary, unless it was caused by reasons beyond the alien's control and for which he was not responsible, does not control here. The applicable INS regulation only requires a "temporary absence," without the additional limitations contained in the State Department regulation. *See* 8 CFR 242.7a.

43

whether these factors are cited merely as objective manifestations of the alien's *animus revertendi* (or lack thereof), or whether they are meant to have independent legal significance. For the most part, we think they are primarily useful as indicia of the alien's intent. *See, Matter of Kane, supra,* at 7–8. Of these additional factors, we are inclined to attach substantive significance solely to the duration of the stay abroad, if only because the word temporary connotes an element of duration. *Cf., Gamero* v. *INS, supra,* 367 F. 2d at 127.[21] The view that there are ultimate durational limits on a "temporary visit" is evident in the passage from *United States ex rel. Lesto* v. *Day,* quoted earlier, that "the intention of the departing immigrant must be to return within a period relatively short, fixed by some early event." 21 F. 2d at 308–09.

It seems likely that many permanent resident aliens who left the country to avoid military service did so with the specific intent of staying away "for the duration" and returning to the United States when it was possible to do so without incurring criminal liability. In our view, the formulation in *United States ex rel. Lesto* v. *Day* is sufficiently flexible to permit the Department to regard the "duration" as a "period relatively short" under the special circumstances present here, with that period being fixed by the "early event" of a Presidential pardon, whenever it might come. *Cf., Gamero* v. *INS, supra,* 367 F. 2d at 126. This approach is particularly justified here because the principal deterrent to the aliens' return—and therefore the principal reason why their visits abroad became protracted—was the fact that they had committed offenses that could give rise to criminal liability.[22] The pardon excuses these very offenses. It is consistent with the purposes of the pardon to insure that its beneficiaries are not penalized by attaching undue significance to the duration of the visit, which resulted from the commission of the pardoned offenses.

This is not to say that every pardoned alien who was once lawfully admitted for permanent residence must automatically be regarded as a permanent resident returning from a temporary visit abroad. A factual question may still exist in some cases as to whether the alien possessed the requisite *animus revertendi* during his absence. Because of the pardon, the Attorney General might wish to consider instructing INS to adopt a liberal policy in this regard or to make clear that a protracted stay due to the possibility of criminal liability will be regarded as a temporary visit abroad if the alien intended to return when he could do so without incurring criminal liability. It might even be possible, as a

---

[21] Thus, if an alien left the country with a fixed intention to return to the United States after 20 years, the conceded presence of *animus revertendi* for that period would probably not alone permit the alien's visit abroad to be regarded as "temporary." But that will not be the situation with many permanent resident aliens who will benefit from the pardon. *Cf., Matter of Castro,* 14 I&N Dec. 492, 494 (1973).

[22] Thus, aliens who remained out of the country because of their possible criminal liability have an explanation for their protracted stay that is consistent with an intent to return to the United States as soon as they could. *Cf., United States* v. *Trudell,* 49 F. 2d at 732; *Matter of Kane, supra,* at 7. *See* note 18, *supra.*

procedural matter, to adopt a presumption that a permanent resident possessed the intent to return during his absence, although this would to some extent be in derogation of the case-by-case approach normally followed.

JOHN M. HARMON
*Acting Assistant Attorney General*
*Office of Legal Counsel*